**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| DAEDALUS PRIME LLC, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 7:25-cv-00313-DC-DTG |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>GOOGLE LLC'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  FACTUAL BACKGROUND....................................................................................2

III.  PROPOSED CONSTRUCTIONS ...........................................................................4

IV.  ARGUMENT.......................................................................................................6

    A.  Specific Constructions .........................................................................6

        1.  "interface unit" ('167 patent, claim 21) ........................................7

            a.  The claim language places the interface unit within the processor architecture. ......................................................7

            b.  The specification confirms an integrated processor architecture with internal interconnects. ...........................8

        2.  "Energy performance bias (EPB) value" ('197 patent, claims 1-6, 8-16, 18)..........................................................10

            a.  The specification confirms Google's proposed construction.........11

            b.  The prosecution history confirms that an EPB Value indicates a user's preference for a tradeoff between power savings and performance...............................................13

            c.  The extrinsic evidence is consistent with the intrinsic evidence and supports Google's construction.............................14

        3.  "Workload configuration input/value" ('197 patent, claims 1-2, 15)........16

        4.  "dynamically tune power allocation/dynamically balancing power" ('494 patent, claims 1-2, 8-9, 12, 16).........................................19

    B.  Indefiniteness .................................................................................24

        1.  "is to" ('833 patent, claims 15-18; and '197 patent, claims 2-3, 5-7, 9-10, 15-16, 18-20) ...............................................24

V.  CONCLUSION...................................................................................................27

6034063.v2

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*H-W Tech., L.C. v. Overstock.com, Inc.*,
   758 F.3d 1329 (Fed. Cir. 2014)........................................................................................25

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012).......................................................................................26

*Bandspeed LLC v. Realtek Semiconductor Corp.*,
   2023 WL 11915723 (W.D. Tex. Aug. 11, 2023)..............................................................21

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998)..........................................................................................6

*Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*,
   2015 WL 7295436 (D. Del. Nov. 18, 2015) ..............................................................25, 26

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)........................................................................................24

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
   849 F.2d 1430 (Fed. Cir. 1988)........................................................................................21

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009)........................................................................................23

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
   192 F.3d 973 (Fed. Cir. 1999).........................................................................................22

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
   57 F.4th 1001 (Fed. Cir. 2023) .......................................................................................18

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)........................................................................................24

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010)........................................................................................11

*Inverness Med. Switzerland GmbH v. Warner Lambert Co.*,
   309 F.3d 1373 (Fed. Cir. 2002)........................................................................................22

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)..................................................................................25, 27

*Kaken Pharm. Co. v. Iancu*,
  952 F.3d 1346 (Fed. Cir. 2020)......................................................................................12

*In re Katz Interactive Call Processing Pat. Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011)......................................................................................25

*Lecat's Ventriloscope v. MT Tool & Mfg.*,
  351 F. Supp. 3d 1100 (N.D. Ill. 2018) ...........................................................................25

*Lexion Med., LLC v. Northgate Tech, Inc.*,
  641 F.3d 1352 (Fed. Cir. 2011)................................................................................13, 14

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)..........................................................................................................6

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)............................................................................................6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)........................................................................................................24

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...............................................................................6, 11, 16

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)................................................................................14, 15

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995).....................................................................................6, 14

*Structural Rubber Prods. Co. v. Park Rubber Co.*,
  749 F.2d 707 (Fed. Cir. 1984)..........................................................................................6

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004)........................................................................................6

*UltimatePointer, L.L.C. v. Nintendo Co.*,
  816 F.3d 816 (Fed. Cir. 2016).......................................................................................26

*Visible Connections, LLC v. Zoho Corp.*,
  418 F. Supp. 3d 155 (W.D. Tex. 2019)..........................................................................16

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)..........................................................................................6

**Federal Statutes**

35 U.S.C. § 101................................................................................................................13

35 U.S.C. § 112 .................................................................................................................24, 25, 27

## I.    INTRODUCTION

Plaintiff Daedalus Prime LLC ("Daedalus") is asserting five patents against Google LLC ("Google"), each directed to aspects of multicore processor power management. Daedalus's infringement allegations turn on claim terms that it contends do not require construction or should be given their "plain and ordinary meaning"—a position that, in each instance, would leave the claims ambiguous and untethered from the patents' actual disclosures. The intrinsic record, confirmed by contemporaneous extrinsic evidence, compels specific, precise constructions that align the claim language with the inventions the patents actually describe.

The disputed terms fall into two categories. First, four terms require specific construction:

(1) "interface unit" in the '167 patent, which the specification and claim structure establish is "circuitry of a multicore processor that interconnects the cores to other circuitry," rather than an external component;

(2) "Energy Performance Bias (EPB) value" in the '197 patent, which both the specification and prosecution history confirm means "a value indicating a user's preference for a tradeoff between power savings and performance";

(3) "workload configuration input/value" in the '197 patent, which the specification confirms means "a value indicating a predominant pattern of execution with particular hardware configuration demands (e.g. non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)"; and

(4) "dynamically tune power allocation/dynamically balancing power" in the '494 patent, which the intrinsic record shows refers to "adaptively increasing power for one component while concurrently reducing power to another component".

Second, the "is to" clause used in claims of the '833 and '197 patents, which impermissibly mixes apparatus and method claiming, is indefinite and renders the claims in which it appears invalid.

Google respectfully requests that the Court adopt its proposed constructions and find the indefinite term invalid.

1

## II.    FACTUAL BACKGROUND

This case concerns five patents[1] that were originally assigned to Intel Corp. The parties have proposed constructions for four of those patents,[2] all of which describe mechanisms for distributing power among processor components,

Three of the four patents—the '833, '494, and '197 patents—tackle a challenge familiar to anyone facing resource constraints: ensuring that those resources are directed where they are needed most. Computers have limited power and thermal headroom, meaning different parts of the system must compete for those limited resources. The patents describe ways to distribute those resources with the goal of preserving performance while staying within applicable constraints.

The '833 patent is directed to allocating a processor's overall power budget across multiple "domains" during runtime. Ex. A,[3] '833 patent at Abstract. As the specification explains, modern processors increasingly include multiple functional domains that share a common power budget, but conventional systems purportedly lacked mechanisms to ensure that power is appropriately distributed among those domains based on their workloads. *Id.* at 1:22-26, 1:56-66. The patent describes determining a total power budget for a given time interval, allocating portions of that budget to different domains—such as a core domain and a graphics domain—and controlling the domains' operating frequency accordingly. *Id.* at Abstract. The

---

[1] The asserted patents are U.S. Patent Nos. 8,775,833; 8,898,494; 8,984,228; 10,372,197; and 11,507,167.  It is Google's position that these patents are invalid as, among other things, unpatentable, anticipated, and/or obvious.

[2] The parties have not proposed any constructions for claim terms in the '228 patent, and therefore, Google does not discuss it here.

[3] All exhibits referenced within are attached to the Declaration of Erin E. Meyer in support of Google LLC's Opening Claim Construction Brief.

allocation may be dynamically adjusted based on workload conditions—for example, prioritizing a graphics domain for graphics-intensive workloads or a core domain for compute-intensive workloads. *Id., see also id.* at 7:67-8:4.

The '494 patent is directed to techniques for balancing power and performance among multiple computing elements—such as a central processing unit (CPU), a graphics processor (GPU), and a communication bus—within a shared power or thermal limit. Ex. B, '494 patent at Abstract, Claim 8. The specification asserts that conventional systems managed power for different components independently or based on assumed workloads, without coordinating power allocation to address performance bottlenecks across components. *Id.* at 1:50-57. The '494 patent claims to improve those systems by monitoring different computing elements' workloads and dynamically increasing or decreasing their power—e.g. by adjusting frequency or current—based on those workloads to alleviate bottlenecks and improve overall system performance within constrained power limits. *Id.* at Abstract, 12:6-8.

The '197 patent addresses techniques for controlling processor power management using "a simple high level input from an end user to indicate a power/performance tradeoff preference from the end user." Ex. C, '197 patent at 2:36-38. The specification asserts that modern processors include numerous power-management features, but that these features are typically "statically tuned to tolerate very little performance loss" and are rarely adjusted by end users due to their complexity. *Id.* at 1:62-63, 2:2-5. As a result, any end user that "is willing to tolerate more performance loss" may forego "significant power savings." *Id.* at 1:59-61. To address that alleged problem, the patent describes an "energy performance bias" value—an architectural parameter used by Intel that enables users to "directly control power/performance tradeoff in a simple manner." *Id.* at 2:40-43. A processor's "power controller can receive an energy

3

performance bias . . . value from the core and access a power-performance tuning table based on the value" and uses the information from the table to update one or more power management feature settings. *Id.* at Abstract. The patent further describes embodiments in which a "workload configuration input" can be provided as an additional input to the tuning process, allowing sophisticated users who have "an understanding and control of the exact workloads running on their systems" to make additional adjustments to the power/performance tradeoff. *Id.* at 6:61-7:14.

Whereas the prior three patents cover techniques affecting how much power is distributed to computer components, the '167 patent describes apparatuses controlling how that distribution is effectuated. The '167 patent is directed to systems for controlling transitions between different voltage levels for a multicore processor. Ex. D, '167 patent at 2:28-46. The patent asserts that conventional approaches to voltage scaling can introduce latency, particularly when waking cores from a low-power state because awakening those cores may require first adjusting the "worst case" current draw required by the processor overall. *Id.* at 1:51-62. To address that purported problem, the patent describes multi-phase voltage transitions, in which the operating voltage for one component is first raised to an intermediate or "safe" voltage level and then subsequently increased to a final target voltage. *Id.* at 2:28-46. This staged approach allows other processor components—such as cores exiting low-power states—to be activated while the first component's voltage is at an intermediate level and without waiting for a full voltage ramp, which purportedly reduces latency and improves responsiveness during power-state transitions. *Id.*

## III.   PROPOSED CONSTRUCTIONS

The following table identifies the terms being construed, each party's proposed constructions, and the patent claims in which each term appears.

| Claim Term | Patent Claims | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|---|
| "interface unit" | '167 patent, claim 21 | "Circuitry of a multicore processor that interconnects the cores to other circuitry" | Plain and ordinary meaning |
| "EPB value" | '197 patent, claims 1-6, 8-16, 18 | "A value indicating a user's preference for a tradeoff between power savings and performance" | Plain and ordinary meaning, in which the plain and ordinary meaning is "a value influencing a tradeoff between power optimization and performance optimization" |
| "Workload configuration input/value" | '197 patent, claims 1-2, 15 | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g. non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)" | No construction necessary |
| "dynamically tune power allocation/dynamically balancing power" | '494 patent, claims 1-2, 8-9, 12, 16 | "Adaptively increasing power for one component while concurrently reducing power to another component." | Plain and ordinary meaning |
| "is to" | '197 patent, claims 2-3, 5-7, 9-10, 15-16, 18-20; '833 patent, claims 15-18 | The term is indefinite | Not indefinite |

## IV.     ARGUMENT

### A.     Specific Constructions

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). "The appropriate starting point [] is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). That language should be read first and foremost in light of the specification, which is "the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). The correct claim construction is the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* at 1316. The claim language, written description, and patent prosecution history thus form the intrinsic record that is most significant when construing a term. *Id.* at 1315–17; see also *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court may also consider extrinsic evidence if it "deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). But extrinsic evidence may not be used to contradict or change the meaning of claims. *Id.* at 1319 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)).

The Court's ultimate goal in construing claim terms is "giv[ing] the jury guidance that 'can be understood and given effect by the jury once it resolves the issues of fact which are in dispute.'" *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (quoting *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 718 (Fed. Cir. 1984)). The jury must be able to "intelligently determine the questions presented." *Id.* (citation and internal quotation marks omitted). Thus, the plain and "ordinary meaning" of technical terms is only helpful when that meaning is "readily apparent even to lay [people]." *Phillips*, 415 F.3d at 1314.

6

### 1.    "interface unit" ('167 patent, claim 21)

| Claim Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "interface unit" | "Circuitry of a multicore processor that interconnects the cores to other circuitry" | Plain and ordinary meaning |

The Court should construe "interface unit" as "circuitry of a multicore processor that interconnects the cores to other circuitry" in claim 21 of the '167 patent. That construction reflects the processor architecture described in the patent and clarifies that the term refers to circuitry that resides *on* the processor, not an external component.

Daedalus's anticipated reliance on "plain and ordinary meaning" risks improperly broadening the term. The critical issue is the location of the "interface unit"—whether it is on-chip circuitry integral to the processor itself, or an external component—not the components toward which its communications flow. Left unconstrued, "interface unit" could be read to encompass any off-chip or external communication device. The patent, however, claims and describes a self-contained multicore processor architecture in which cores are coupled to an "interface unit" as part of the processor itself. Construing the term to require circuitry of the multicore processor that interconnects the cores to other circuitry aligns the claims with that architecture and prevents a reading untethered from the patent.

#### a.    *The claim language places the interface unit within the processor architecture.*

The claim language itself situates the interface unit within the architecture of the claimed processor. Claim 21 states that "the first plurality of cores and second plurality of cores are further coupled to an interface unit." To be sure, the phrase "coupled to," viewed in isolation, does not by itself resolve whether the interface unit is on-chip or off-chip. But the claim does not

7

describe the interface unit as a separate peripheral, external interface, or off-chip device. Instead, the "interface unit" is introduced as a constituent structural component of the processor alongside the "plurality of cores" and the "power control unit." Moreover, Claim 21 claims an "interface unit" to which both the first and second pluralities of cores are coupled—a structural relationship that only makes sense for an on-chip component serving as an interconnect between those core clusters and the broader processor, consistent with the "uncore" architecture described in the specification, discussed below.

That point is reinforced by what the claims do not say. Claim 21 does not refer to off-chip devices, external buses, or peripheral components. Nor does any other asserted claim use "interface unit" to describe a component outside the processor. Read in context, the most natural understanding is that the claimed interface unit is part of the multicore processor itself and supports communication between the cores and other circuitry associated with that processor.

The dependent-claim structure points in the same direction. When the patent intends to identify a different electrical or architectural region, it does so expressly—for example, by referring to a "different power domain" in Claim 19. Claim 21, by contrast, introduces the "interface unit" simply as another element to which the processor's cores are coupled, without any suggestion that it is external to or distinct from the processor. Read in context, that supports an understanding of the "interface unit" as circuitry of the processor, not an off-chip component.

          **b.**       ***The specification confirms an integrated processor architecture with internal interconnects.***

The specification confirms that an interface unit means a multicore processor in which cores operate within a shared processing environment and interact with other processor components, including caches, control logic, and voltage-management structures. For example, the patent explains that a processor includes an "uncore" region that comprises "interfaces" and

"a power control unit." Ex. D, '167 patent at 12:47-53. This "uncore" is explicitly described as being "within [the] processor." *Id.*; *see also* Fig. 8; id. at 3:26-30.

Most importantly, the specification expressly describes an internal "interface unit" within each core that performs precisely the function Google's construction captures. In the embodiment shown in Figure 7, "each core unit 510 includes an interface 515 such as a bus interface unit to enable interconnection to additional circuitry of the processor." *Id.* at 11:43-46; *see also id.* at 2:57-58 ("each core unit may include multiple cores, a cache memory, an interface unit and so forth"). That disclosure is clear intrinsic evidence that an "interface unit" in the claimed processor is on-chip circuitry whose function is to connect the cores to other circuitry of the processor.

The patent likewise describes a processor architecture in which cores are connected to additional on-chip components through integrated structures such as system agents and shared resources. For example, it describes an "uncore" including "a shared cache," "interfaces," and "a power control unit." *Id.* at 12:47–53. These disclosures reflect a processor in which cores communicate with other circuitry through internal interconnect mechanisms. The invention itself depends on coordination between cores and other circuitry during voltage transitions and wake events, which further suggests that the relevant communication mechanisms are internal to the processor. *Id.* at 5:65–6:4; 9:4–17.

While the specification also refers to an off-chip interface—"one or more interfaces 580 such as a PCIe™ interface to enable the communication with one or more offchip devices", *id.* at 12:28–39—that disclosure actually supports Google's construction. Claim 21 describes an "interface unit" specifically "coupled" to the cores of the processor, adopting the nomenclature used by the specification for "interface unit" 515. By contrast, interface 580 is described only as

9

an "interface." Figure 7 shows that distinction between interface unit 515 and interface 580 is structural and not just semantic: interface unit 515 is housed within the core unit 510, coupled directly to the cores to handle "interconnection to additional circuitry"—just as Claim 21 describes—while interface 580 is situated outside the core unit entirely. *See id.* at 11:43-46; *see also* Fig. 7. The specification thus characterizes these as distinct components with distinct roles: the interface unit 515 governs the cores' immediate connection(s), while the external interface unit 580 is dedicated to communication with remote, off-chip devices. In other words, the specification and Figure 7 confirm that the "interface unit" of Claim 21 is on-chip circuitry internal to the processor's core unit.

A construction that includes external devices would therefore expand the term beyond the architecture described in the '167 patent and untether the claim language from the intrinsic record. Google's construction is faithful to the claim language, aligns with the specification's description of the processor architecture, and provides clear guidance to the jury. The Court should therefore adopt Google's construction.

2.    **"Energy performance bias (EPB) value" ('197 patent, claims 1-6, 8-16, 18)**

| Claim Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "EPB value" | "A value indicating a user's preference for a tradeoff between power savings and performance" | Plain and ordinary meaning, in which the plain and ordinary meaning is "a value influencing a tradeoff between power optimization and performance optimization" |

The term "Energy Performance Bias Value" ("EPB Value") should be construed to clarify its scope and resolve ambiguities. Plaintiff claims that the term should be given its "plain

and ordinary meaning," but the term has no settled, standalone meaning untethered from the '197

patent and Intel's contemporaneous work. Construction is therefore required to resolve the scope

of the claim language. When a patent uses "[i]diosyncratic language, highly technical terms, or

terms coined by the inventor" those terms "are best understood by reference to the specification."

*Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips v. AWH Corp.*,

415 F.3d 1303, 1315 (Fed. Cir. 2005). Google's construction tracks the '197 specification, its

prosecution history, other intrinsic evidence, and extrinsic evidence. It also aligns with the

patent's stated goal of giving users a simple way to control what may otherwise be complicated

power management features.

### a.    *The specification confirms Google's proposed construction.*

*First*, the specification consistently describes EPB Value as an input that reflects a *user's*

preference for trading off power and performance. The focus on user preferences starts with the

patent's title: "User level control of power management policies." The specification also

explains:

> Embodiments provide a so-called energy performance bias (EPB) as
> an architectural feature. ***Control of this parameter allows for a
> simple high level input from an end user to indicate a
> power/performance tradeoff preference from the end user***. This
> input can be used to provide multiple tuning levels with different
> points of power and performance tradeoff. ***By associating this
> energy performance bias with direct user input, embodiments
> enable the end user to directly control power/performance tradeoff***
> in a simple manner.

Ex. C, '197 patent, 2:34-43 (emphases added). This passage repeatedly emphasizes the role of

the end user in supplying the preferred power/performance tradeoff. The specification goes on to

describe how a user can express those preferences. *Id.* at 2:53-61.

11

The specification then contrasts the complexity of power management in the prior art with the simplicity supposedly embodied by the purpose of the invention. As described by the patent, a problem with power management features found in the prior art was that "users rarely venture into tuning individual features for their target usage, and thus the potential benefit of the features are often not realized." *Id.* 2:2-5. To solve that problem, the patentee said it created the EPB Value so that "instead of providing complete tuning flexibility for each power management technology and allowing an end user to tune each feature, a single input can be provided by the user to control these different features." *Id*. at 2:48-51.[4] Table 1 provides an example of complex power management features described by the specification as "disparate and large." *Id.* at 3:6-8. Rather than tuning these settings individually, the specification explains that the EPB Value "allows an end user to choose a range of choices between performance-oriented tuning settings and power saving-oriented tuning settings." *Id.* at 3:46-49. In sum, the specification consistently defines EPB Values as a value provided by a ***user***.

***Second***, the specification repeatedly and consistently shows that EPB Values are a value designed to indicate a user's preference for trading off ***power savings versus performance***. For example, the specification explains that "instead of providing complete tuning flexibility for each power management technology and allowing an end user to tune each feature, a single input can be provided by the user to control these different features." *Id.* at 2:48-51. Further, the claimed tuning circuit "can be used to receive incoming EPB values from multiple cores of a multicore processor and use these values to determine an appropriate tradeoff between power and performance policies and provide settings to the agents responsible for controlling various power

---

[4] "A patent's statement of the described invention's purpose informs the proper construction of claim terms. . . .". *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020).

12

management features of a system including the processor." *Id.* at 4:58-67. Table 2 describes bucketing (i.e., binning) EPB Values into categories that "may directly map to power/performance profiles supported by certain operating systems." *Id.* at 5:51-53. These disclosures consistently describe EPB values as indicating the end user's preference for where the system should fall on the spectrum between power savings and performance.

> **b.** **_The prosecution history confirms that an EPB Value indicates a user's preference for a tradeoff between power savings and performance._**

The applicant also confirmed Google's definition during prosecution. The Examiner initially rejected the claims of the '197 patent application under 35 U.S.C. § 101 as being directed to an abstract idea. To overcome that rejection, the applicant amended current claims 1 and 11 to include the claimed tuning circuit and stated, "[s]pecifically, the Specification describes that an EPB value allows an end user to control power/performance tradeoffs in a simple manner." Ex. E, '197 Pros. History, Remarks/Arguments dated Nov. 2, 2018 at 9. The applicant continued, telling the Patent Office that, "[s]tated another way, embodiments here and as expressed in the claims provide a manner to enable at least one setting of a power management feature to be updated even where a non-technical user has little or no understanding of an ability to tune such features. . . . As such, the Specification confirms that benefits are provided by way of the improvements in processor functionality disclosed in the Specification and recited in the claims." *Id.* at 9-10. Based on the applicant's own statements to the patent office, it is clear that an EPB Value indicates a user's preference for a tradeoff between power savings and performance. *See Lexion Med., LLC v. Northgate Tech, Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) (interpretation of a claim term "should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention.").

13

In responding to the initial rejection, the applicant surrendered claim scope by arguing that the ability of a non-technical user to provide EPB Values reflecting a power/performance tradeoff to a processor were more than "generalized steps to be performed on a computer using conventional computer activity." Ex. E, '197 Pros. History, Remarks/Arguments dated Nov. 2, 2018 at 9. Specifically, the applicant argued that the claims were patentable because they allowed non-technical users to provide EPB Values to the tuning circuit and thereby affect the hardware's power management. *Id.* As a result, the applicant's statements result in prosecution history estoppel. *Southwall Techs.*, 54 F.3d at 1583 ("Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel.").

### c.    *The extrinsic evidence is consistent with the intrinsic evidence and supports Google's construction.*

Finally, contemporaneous extrinsic evidence from Intel (the original assignee on the face of the '197 patent) also confirms that the company's use of the EPB Value term comported with the use of the term in the specification and prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.").

The inventors' own words confirm that EPB Value is a value indicating a user's preference for a tradeoff between power savings and performance. Plaintiff produced an invention disclosure statement related to the '197 patent that describes EPB Value in the same way as the specification and Google's definition. Ex. F, INTEL-000132 at 136. Just as described by the specification, the invention disclosure statement describes the EPB Value as a preference

14

for a power/performance tradeoff from a user. *Id.* The inventor's understanding of the invention is entirely consistent with the specification, intrinsic evidence, and Google's proposed definition.

Other extrinsic evidence also shows that when addressing persons of skill in the art, Intel used terms related to EPB Value consistent with the '197 patent specification and prosecution history. Specifically, Intel used the terms "MSR_IA32_***ENERGY_PERF_BIAS***" and "energy versus performance policy preference bias" in public internet posts and software repositories consistent with the patent's understanding of EPB Values more than a year before the '197 patent's priority date. Ex. G, GOOG-DPRIME-PA-00000161, 163 (https://lkml.org/lkml/headers/2010/9/28/246); Ex. H, GOOG-DPRIME-PA-00000605 (https://github.com/torvalds/linux/commit/d5532ee7b40b4a64e605e543b0387694430ecb7); Ex. I, GOOG-DPRIME-PA-00007427, 8040-41 (Intel SDM Manual 2010) (emphasis added). For example, an Intel engineer working on the Linux operating system told other Linux programmers that a feature called "MSR_IA32_ENERGY_PERF_BIAS" implemented on certain Intel chips "allows software to convey its policy for the relative importance of performance versus energy savings." Ex. G at -163. The Intel engineer explained that he implemented the feature in the "user-space," e.g., in the part of the operating system that can talk to user software, not in the operating system's kernel itself. *Id.* In sum, the Intel engineer described implementing functionality that allowed users to express their preference for a tradeoff between power savings and performance to the operating system.

Given that the specification, prosecution history, and extrinsic evidence all confirm that the patentee used EPB Value consistently to mean "a value indicating a user's preference for a tradeoff between power savings and performance," the Court should adopt Google's construction. That definition "comports with the stated purpose of the patent and the use of the

15

term throughout the specification." *Visible Connections, LLC v. Zoho Corp.*, 418 F. Supp. 3d 155, 162 (W.D. Tex. 2019).

### 3.    "Workload configuration input/value" ('197 patent, claims 1-2, 15)

| Claim Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "Workload configuration input/value" | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g. non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)" | No construction necessary |

The terms "workload configuration input" (claim 1) and "workload configuration value" (claim 15) also require construction. Plaintiff advocates for "plain and ordinary meaning," but that position does not resolve the parties' apparent dispute over the claims' scope—namely, whether the term encompasses a generic power/performance control scheme (as Plaintiff's infringement contentions suggest) or instead is directed to an input identifying a predominant type of workload to be run, as the claims and specification describe. The Court should resolve that dispute.

The claim language itself provides a roadmap for understanding the meaning of "workload configuration input." Claim 15 explicitly states that the "workload configuration value" is "to indicate a predominant workload type to be executed on the system," which provides meaning to the term and supports Google's construction. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314.

16

The specification supports that understanding through the single paragraph in the specification directly addressing the claim term:

> In some embodiments, in addition to the EPB input, a workload configuration input can be provided. To this end, the table can have 3 dimensions such that based on the workload configuration input, a different set of entries for the defined power management features can be accessed, as different values may be present in the table for different workload configurations. By this workload configuration input a vertical user having an understanding and control of the exact workloads running on their systems can benefit from well-tuned settings. As examples, a user can configure a workload input as non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, etc. This input allows for choosing tuning settings that favor a specific workload pattern. For example, if the workload is NUMA, aggressive settings can be applied to off-chip interconnects such as Intel® Quick Path Interconnect (QPI) links to save as much power possible while causing very little performance impact, as off-chip accesses can be expected to be low. Thus for embodiments in which a workload configuration input is provided, it can be used as an additional input to access the table.

Ex. C, '197 patent, 6:61-7:14. The paragraph explains that a "workload configuration input" enables users who have "an understanding and control of the exact workloads running on their machines" to "benefit from well-tuned settings." Specifically, this input allows users to "choos[e] tuning settings that favor a specific workload pattern." Thus, in addition to supplying the EPB Value, users can supply a workload configuration value, which enables the system to access specific power management features more applicable to the specified workload.

The examples of workloads in the paragraph provide additional support for Google's definition. The specification explains that "a user can configure a workload input as non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, etc." *Id.* In other words, the "workload configuration input" identifies the predominant

17

pattern of workload to be performed. Once the user supplies this information, the system can access a set of fine-tuned power settings adapted for that specific workload. "For example, if the workload is NUMA, aggressive settings can be applied to off-chip interconnects . . . to save as much power [as] possible while causing very little performance impact, as off-chip accesses can be expected to be low." *Id.* Thus, like the claims, the specification makes clear that a "workload configuration input" is more than just a generic power-management preference—it identifies a predominant type of workload to be performed, which in turn enables the system to access more finely-tuned power settings for that specific workload. *See Grace Instrument Indus., LLC v. Chandler Instruments Co.*, LLC, 57 F.4th 1001, 1010 (Fed. Cir. 2023) ("a skilled artisan would understand that the specification's descriptions of [the term] and the corresponding embodiments adequately guide the skilled artisan to the meaning of [the term].").

The rest of the specification is in accord. The Background notes that a problem in the prior art is that "there is little knowledge of the actual workload and usage pattern for the system in the field." Ex. C at 1:55-57. The invention attempts to solve the problem by explaining how a sophisticated user can "tune" the power management of a chip using different workloads to arrive at various power/performance settings. *Id.* at 8:40-52. The specification explains that "each individual power management feature is tuned separately while the other features are turned off." *Id.* at 8:40-43. This tuning includes generating a power/performance profile across a range of workloads for each feature. *Id.* at 8:43-45. As an example, various benchmark workloads can be executed to generate the profile." *Id.* at 8:45-47. This passage suggests that different workloads, e.g., patterns of data execution with particular hardware demands, are run individually with each power management feature to create a profile that shows how the workload responds to each power management feature. The specification also notes that "tuning

18

can be achieved via an iterative process in which different EPB values are input and workloads run with each setting." *Id.* at 8:54-58. These passages reinforce that "workload" in the '197 patent refers to the type of work the system is expected to execute, not merely a generalized preference about power or performance.

Given the claim language and the specification's examples, which describe the "workload configuration value / input" as a value that describes a predominant pattern of execution with particular hardware configuration demands such as NUMA, UMA, I/O intensive, etc., the Court should adopt Google's proposed construction.

### 4. "dynamically tune power allocation/dynamically balancing power" ('494 patent, claims 1-2, 8-9, 12, 16)

| Claim Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "dynamically tune power allocation/dynamically balancing power" | "Adaptively increasing power for one component while concurrently reducing power to another component." | Plain and ordinary meaning |

Google's proposed construction of "dynamically tune power allocation/dynamically balancing power" correctly clarifies that these terms refer to a system that, while a program is running, adapts to changing performance demands by redistributing power among components—*i.e.*, increasing power to one component while reducing power to another.

That commonsense reading is fully consistent with the purpose of the alleged invention and the intrinsic record. As the specification explains, the '494 patent addresses a specific problem: "a device with a host processor and a graphics processor usually implements power savings policies individually and separately. And . . . it often only contemplates assumed power

requirements for each of the individual devices without balancing power and performance amongst asymmetric cores to achieve maximum overall performance." Ex. B, '494 patent at 1:50-57. The claimed invention purports to solve that problem by "allocat[ing] more current/frequency" to a computer component "that is determined to be a bottleneck for performance" while a "competing device is capped/limited." *Id.* at 7:52-56. "In other words, a dynamic balance is continuously stuck[sic] between devices to ensure the device that needs more resources for better overall performance is allocated such extra resources, while other devices are 'balanced' (reduced in performance) to meet a given power limit." *Id.* at 7:56-61.

Google's proposed construction of "dynamically tune power allocation/dynamically balancing power" captures exactly that mechanism: real-time adaptation to performance demands by increasing power to one component at the expense of another. That is not an ancillary feature—it is the core of the claimed invention. The intrinsic record consistently describes the claimed invention in those terms. Indeed, in its preliminary response to a request for institution of IPR, Plaintiff cited to the above description of the claimed invention, and further noted that:

> The '494 Patent describes a processor that efficiently balances performance and power . . . to increase system performance while operating within thermal limits. . . . The inventors of the '494 Patent thus determined that . . . *increasing* power supplied to high-activity elements improves overall system functionality by reducing bottlenecking. However, because the amount of power available within an integrated circuit is limited, the increase in power supplied (e.g. by increasing frequency) to high-activity processor components must come from a limited power budget. The inventors of the '494 Patent therefore determined that the power allocation must be tuned between the components.

Ex. J, IPR 2023-00617 POPR at 2-3 (emphasis in original) (quoting '494 patent at 7:40-61).

Because that statement aligns with Google's proposed construction, it supports adopting that

construction. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir. 1988) (holding that statements made during reissue/reexamination proceedings "are relevant prosecution history when interpreting claims").

The PTAB's description of the claimed invention similarly describes offsetting increases in power supplied to one component by decreasing the power supplied to another.

> The '494 patent relates to an apparatus, method, and system for efficiently balancing performance and power between processing elements or a communication bus by identifying and alleviating bottlenecks based on measured workloads. . . .The '494 patent describes alleviating bottlenecks by allocating more current or frequency to the bottlenecked component and capping or limiting competing devices. This strikes a dynamic balance between devices so that a device that needs more resources for better overall performance is allocated extra resources, while other devices are reduced in performance to meet a given power limit.

Ex. K, IPR2023-01343 Final Written Decision at 3-4; Ex. L, IPR2023-00617 Decision Instituting IPR at 3-4; Ex. M, IPR 2023-01343 Decision Instituting IPR at 3-4. This, too, supports adopting Google's proposed construction. *Bandspeed LLC v. Realtek Semiconductor Corp.*, No. 1:20-CV-765-DAE, 2023 WL 11915723, at *4 (W.D. Tex. Aug. 11, 2023) ("The approach of this district is to adopt a PTAB decision as part of the patent's intrinsic record.").

The specification reinforces the same point, repeatedly describing embodiments of the invention that increase power supplied to one component while concurrently decreasing the power supplied to another. *See, e.g*, Ex. B, '494 patent at 10:28-35; 10:60-64; 11:32-37; 14:1-10; 15:28-34; 18:3-6; 18:31-34.

Importantly, the prosecution history confirms that Google's proposed construction is necessary to align this fundamental understanding of the invention with the claim language. When rejecting an earlier version of what became claim 1 of '494 patent, the patent examiner

21

characterized the claim as "direct[ed] to a **reduction** of frequency of components for optimized

performance" which "would allow for **more resources** to allocate to the cores or vice versa." Ex.

N at 7, 10/4/2013 Office Communication at 7 (emphases added). The only way to square the

examiner's description of the claim with the claim language itself would be to construe

"dynamically tune power allocation" consistent with Google's proposed construction. No other

language in the claim addressed power distribution:

> An apparatus for efficient energy consumption comprising: an integrated circuit including, a first core; a communication bus coupled to the first core; a core workload monitor configured to determine a bus workload for the communication bus; and balancing control adapted to **dynamically tune power allocation** between the first core and the communication bus based on a power limit for the integrated circuit and at least the bus workload.

*Id.* at 5 (emphasis added). Notably, that characterization was never disputed, further confirming

the accuracy of both the description of the claimed invention and Google's proposed

construction. *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380

(Fed. Cir. 2002) ("To be sure, failure to object to an examiner's interpretation of a claim

ordinarily disclaims a broader interpretation."); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192

F.3d 973, 979 (Fed. Cir. 1999) (failure to respond to an examiner's reason for allowance

disavowed different interpretation of claim).

The same analysis applies to "dynamically balancing power." The '494 patent's

specification uses the terms "balancing" and "allocation" interchangeably. *See, e.g.*, Ex. B, '494

patent at 3:15-21 ("The method and apparatus described herein are for balancing power between

multiple asymmetric devices to achieve maximum overall performance. Specifically, power

balancing and allocation is primarily discussed below in reference to an integrated circuit and/or

package including a central/host processor (or cores thereof) and a graphics processor (or cores

thereof) (emphases added)); *id.* at 10:16-21 ("Therefore, as another example frequency between the individual cores is balanced. In this scenario, power module 520 is to dynamically tune frequency allocation between core 505 and core 510 based on a power limit for an integrated circuit or package . . . ."). Thus, their meanings are the same. *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("The interchangeable use of the two terms is akin to a definition equating the two.").

And the ordinary meaning of "balance"—"[t]o compensate, neutralize the effect of, make up for" Ex. O at 3, GOOG-DPRIME-PA-00033360, 362 (Oxford English Dictionary) (https://www.oed.com/dictionary/balance_v?tab=meaning_and_use&tl=true)—reinforces Google's construction: balancing power necessarily entails neutralizing an increase to one component with a decrease to another. Indeed, that is precisely how the specification uses the term when it describes how "a dynamic balance is continuously stuck [sic] between devices to ensure the device that needs more resources for better overall performance is allocated such extra resources, while other devices are 'balanced' (reduced in performance) to meet a given power limit." Ex. B, '494 patent at 7:56-61; *see also id.* at 17:36-41 ("Therefore, a power increase for communication bus 950 (and potentially for GPU cores 910) is dynamically balanced with a cap of CPU cores 905 (and potentially GPU cores 910) to alleviate the bottlenecks in the system to increase performance, while not exceeding the current limit for IC 900."); *id.* at 18:3-6 ("As a result, the balancing algorithm takes such a tying into account, so GPU cores 909 may be reduced to balance the effect from bus 950 and CPU cores 905 being increased.").

In short, the intrinsic record uniformly describes a single concept: real-time, zero-sum reallocation of a limited power budget among components to optimize performance. Google's

proposed construction faithfully reflects that concept and aligns the claim language with the specification and prosecution history. The Court should adopt it.

### B.    Indefiniteness

A patent claim is invalid for indefiniteness under pre-AIA 35 U.S.C. § 112 ¶ 2[5] if the claim language, "read in light of the patent's specification and prosecution history, fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 898-899 (2014). The purpose of this "definiteness requirement" is "to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

### 1.    "is to" ('833 patent, claims 15-18; and '197 patent, claims 2-3, 5-7, 9-10, 15-16, 18-20)

| Claim Term | Google's Proposed Construction | Daedalus's Proposed Construction |
|---|---|---|
| "is to" | The term is indefinite | Not indefinite |

Several asserted claims in the '833 and '197 patents claim an apparatus but also recite operation of the claimed apparatus using the phrase "is to," such as "the power sharing logic is to dynamically allocate substantially all of the variable power budget to the first domain for a first

---

[5] Although the America Invents Act's revisions to Section 112 ¶ 2 are not material, the pre-AIA version of the statute applies here because all of the asserted patents claim priority to applications filed before March 16, 2013, the effective date of the AIA.

workload" in claim 15 of the '833 patent. These claims are indefinite under 35 U.S.C. § 112 ¶ 2 because they purport to claim both a system and its use, in violation of the rule against so-called "hybrid" or "mixed-mode" claiming. It is black-letter law that a claim that "recites both a system and the method for using that system . . . does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, [¶] 2." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The rationale for this rule is that when a claim mixes statutory classes of invention, "it is unclear when infringement occurs*." H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335 (Fed. Cir. 2014); *see also In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (holding that apparatus claims are indefinite when they require both specific structure and the performance of method steps, rather than merely reciting the structure's functional capability). When a claim recites both an apparatus and the use of that apparatus, for example, "a manufacturer or seller of the claimed apparatus would not know from the claim whether it might also be liable for contributory infringement because a buyer or user of the apparatus later performs the claimed method of using the apparatus." *IPXL Holdings*, 430 F.3d at 1384. "[T]his type of indefiniteness depends only on whether the claim, on its face, recites both an apparatus and method steps of using the apparatus." *Lecat's Ventriloscope v. MT Tool & Mfg.*, 351 F. Supp. 3d 1100, 1113 (N.D. Ill. 2018).

In *Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015), for example, system claims covering a coffee brewing machine recited "the brew baskets being inserted into the location in the beverage brewing machine," "the brew baskets being individually inserted into the location during an associated brewing operat[ion]," and "the brewing machine heating water from the water reservoir." *Id.* at

25

*4–5. The court found the claims invalid as indefinite due to hybrid claiming, reasoning that "a person of ordinary skill in the art would not understand whether the claims . . . are infringed by an apparatus capable of heating water and having brew baskets inserted or when a person actually uses the beverage brewing system to heat water and inserts a brew basket." *Id.*

The claims of the '833 and '197 patents that use the verb phrase "is to" to recite the performance of certain actions by the claimed "system" (or "processor") are indefinite for the same reason. For example, claim 15 of the '833 patent requires that the system's "power sharing logic" *is to* "dynamically allocate substantially all of the variable power budget" in various ways. Ex. A, '833 patent, cl. 15. Claims 16–18 of the '833 patent similarly require that the system's "power sharing logic" *is to* take certain actions: increment certain values (claim 16) or further allocate portions of the power budget in various ways (claims 17-18). The claims of the '197 patent likewise require performance of certain actions by the claimed "system" or "processor." For example, claim 2 of the '197 patent requires that the processor's "power controller" *is to* "access a power-performance tuning table." Ex. C, '197 patent, cl. 2. This "is to" requirement does not merely "reflect the capability of the claimed apparatus," which is a permissible form of claiming that does not run afoul of the rule against hybrid claiming. *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 827 (Fed. Cir. 2016). The claims do not, for example, use familiar capability language such as "configured to" or "adapted to," formulations courts have recognized can denote structural capability rather than actual performance. See Id. at 826–27; *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012). Instead, the claims' present-tense formulation—mandating that the claimed logic or controller "is to" perform the recited actions—reads as an operational requirement, leading to claims that cover both a "system" (or "processor," in the case of the '197 patent) and its use. That form of claiming

violates the rule against hybrid claims and creates the uncertainty that *IPXL* and its progeny prohibit: it is impossible to tell from the face of the claims whether infringement occurs when an allegedly infringing apparatus is made or sold, or only when it actually performs the recited steps, rendering the claims indefinite under Section 112 ¶ 2.

## V.    CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court (1) adopt Google's proposed constructions of "interface unit," "energy performance bias (EPB) value," "workload configuration input/value," and "dynamically tune power allocation/dynamically balancing power"; and (2) find that the "is to" claims of the '833 and '197 patents are indefinite and therefore invalid.

Dated:  April 1, 2026                                    Respectfully submitted,


By: */s/ Erin E. Meyer*
David Silbert (*pro hac vice*)
dsilbert@keker.com
Erin E. Meyer (*pro hac vice*)
emeyer@keker.com
Christopher S. Sun (*pro hac vice*)
csun@keker.com
Andrew S. Bruns (*pro hac vice*)
abruns@keker.com
Vishesh Narayen (*pro hac vice*)
vnarayen@keker.com
Ryan J. Hayward (*pro hac vice*)
rhayward@keker.com
Jacqueline Cancilla (*pro hac vice*)
jconcilla@keker.com
Niharika Sachdeva (*pro hac vice*)
nsachdeva@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Tel: 415-391-5400

Nathaniel St. Clair, II
nstclair@jw.com
JACKSON WALKER LLP
323 Ross Ave #600
Dallas, TX 75201
(214) 953-6000

Karineh Khachatourian
karinehk@kxtlaw.com
Trevor Giampaoli
David T. Xue
KXT Law, LLP
1775 Woodside Road, Suite 204
Redwood City, CA 94061
Tel: (650) 239-0420

Attorneys for Defendant
GOOGLE LLC

28

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on April 1, 2026, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/ Paige Welch*

29