# EXHIBIT N

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/398,641 | 02/16/2012 | Travis T. Schluessler | P38525X | 1050 |

| | |
|---|---|
| 59796          7590          10/04/2013 | EXAMINER |
| INTEL CORPORATION | CHAN, DANNY |
| c/o CPA Global | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2115 | |

INTEL CORPORATION
c/o CPA Global
P.O. BOX 52050
MINNEAPOLIS, MN 55402

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/04/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

heather.l.adamson@intel.com
inteldocs@cpaglobal.com

PTOL-90A (Rev. 04/07)

PUB_GOOGLE00001450

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 13/398,641 | SCHLUESSLER ET AL. |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | DANNY CHAN | 2115 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☒ Responsive to communication(s) filed on *February 16, 2012*.

  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL**.    2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims

5) ☒ Claim(s) *1-13* is/are pending in the application.

  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) *1-13* is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

## Application Papers

10) ☒ The specification is objected to by the Examiner.

11) ☒ The drawing(s) filed on *February 16, 2012* is/are: a) ☐ accepted or b) ☒ objected to by the Examiner.

  Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

  **Certified copies:**

  a) ☐ All   b) ☐ Some *  c) ☐ None of the:

  1. ☐ Certified copies of the priority documents have been received.

  2. ☐ Certified copies of the priority documents have been received in Application No. _____.

  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

  * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08)
  Paper No(s)/Mail Date *6/10/2013 and 5/19/2013*.

3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date _____ .

4) ☐ Other: _____ .

PUB_GOOGLE00001451

Application/Control Number: 13/398,641                                                        Page 2

Art Unit: 2115

## DETAILED ACTION

1.      The present application is being examined under the pre-AIA first to invent

provisions.

2.      This Office Action is sent in response to Applicant's Communication received

February 16, 2012 for application number 13/398641. The Office hereby acknowledges

receipt of the following and placed of record in file: Specification, Drawings, Abstract,

Oath/Declaration, and claims.

3.      Claims 1 – 13 are presented for examination.

### *Drawings*

4.      The drawings are objected to as failing to comply with 37 CFR 1.84(p)(5)

because they do not include the following reference sign(s) mentioned in the

description: **Element 115 cited in [0022] in applicant's specification is not shown in**

**the drawings**.  Corrected drawing sheets in compliance with 37 CFR 1.121(d) are

required in reply to the Office action to avoid abandonment of the application. Any

amended replacement drawing sheet should include all of the figures appearing on the

immediate prior version of the sheet, even if only one figure is being amended. Each

drawing sheet submitted after the filing date of an application must be labeled in the top

margin as either "Replacement Sheet" or "New Sheet" pursuant to 37 CFR 1.121(d). If

the changes are not accepted by the examiner, the applicant will be notified and

informed of any required corrective action in the next Office action. The objection to the

drawings will not be held in abeyance.

### *Title*

PUB_GOOGLE00001452

Application/Control Number: 13/398,641                                      Page 3
Art Unit: 2115

5.      The title of the invention is not descriptive. A new title is required that is clearly

indicative of the invention to which the claims are directed. The examiner believes that

the title of the invention is imprecise. A descriptive title indicative of the invention will

help in proper indexing, classifying, searching, etc. See MPEP 606.01. However, the

title of the invention should be limited to 500 characters.

### Claim Rejections - 35 USC § 101

6.      35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or
> composition of matter, or any new and useful improvement thereof, may obtain a patent
> therefor, subject to the conditions and requirements of this title.

**Claims 6-9** are rejected under 35 U.S.C. 101 because the claimed invention is

directed to non-statutory subject matter.

As per **claim 6**, the claim recites a "non-transitory medium." Applicant's

specification defines non-transitory medium to include optical storage medium and

transitory matter, such as carrier waves, infrared signals, and digital signals. **A

propagated signal cannot properly be classified in any of the statutory categories

of machine, article of manufacture, process, or composition of matter.** Therefore,

the claimed invention is directed to non-statutory subject matter.

### Double Patenting

7.      The nonstatutory double patenting rejection is based on a judicially created

doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the

unjustified or improper timewise extension of the "right to exclude" granted by a patent

and to prevent possible harassment by multiple assignees.  A nonstatutory double

patenting rejection is appropriate where the claims at issue are not identical, but at least

PUB_GOOGLE00001453

Application/Control Number: 13/398,641                                             Page 4
Art Unit: 2115

one examined application claim is not patentably distinct from the reference claim(s)

because the examined application claim is either anticipated by, or would have been

obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d

1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir.

1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,

686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619

(CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)

may be used to overcome an actual or provisional rejection based on a nonstatutory

double patenting ground provided the reference application or patent either is shown to

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement. A terminal

disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO internet Web site contains terminal disclaimer forms which may be

used. Please visit http://www.uspto.gov/forms/. The filing date of the application will

determine what form should be used. A web-based eTerminal Disclaimer may be filled

out completely online using web-screens. An eTerminal Disclaimer that meets all

requirements is auto-processed and approved immediately upon submission. For more

information about eTerminal Disclaimers, refer to

http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

PUB_GOOGLE00001454

Application/Control Number: 13/398,641 Page 5

Art Unit: 2115

8.     Claims 1-13 are provisionally rejected on the ground of nonstatutory double

patenting as being unpatentable over claim 1-20 of copending Application No.

13/327,670 in view of **Evoy** USPAT 5,758,133.

| Instant Application 13/398641 | Co-Pending Application 13/327670 |
|---|---|
| 1. An apparatus for efficient energy consumption comprising: an integrated circuit including, a first core; a communication bus coupled to the first core; a core workload monitor configured to determine a core workload for the first core; a bus workload monitor configured to determine a bus workload for the communication bus; and balancing control adapted to dynamically tune power allocation between the first core and the communication bus based on a power limit for the integrated circuit and at least the bus workload. | 1. An apparatus for efficient energy consumption comprising: an integrated circuit including, a first core and a second core, the first and second cores being asymmetric cores; a workload monitor adapted to dynamically determine a first workload for the first core and a second workload for the second core; and a balancing module adapted to dynamically tune frequency allocation between the first core and the second core based on a power limit for the integrated circuit and at least the second workload. |
| 6. A non-transitory medium including code, when executed, to cause a machine to perform the energy efficiency operations of: receiving a bus workload for a communication bus and a first processing element workload for a first processing element based on an integrated circuit including the communication bus and the first processing element reaching a limit; determining if the first processing element workload indicates the first processing element is a performance bottleneck; determining if a communication bus is able to accommodate the bus workload; capping a bus frequency of at least the communication bus in response to determining the first processing element workload indicates the first processing element is a performance bottle neck and determining the communication bus is able to accommodate the bus workload; and increasing a previous cap on bus | 11. A non-transitory medium including code, when executed, to cause a machine to perform the energy efficiency operations of: receiving a graphics workload activity over a period of time of a graphics processor on an package including a host processor; determining if the package has reached a thermal design power (TDP) limit; in response to determining the package has reached the TDP limit, indicating a performance-related limit for the host processor is to be decreased responsive to the graphics workload activity over the period of time being greater than an activity threshold; indicating a previous performance-related limit for the host processor it to be increased in response to the graphics workload activity over the period of time being less than the activity threshold. |

PUB_GOOGLE00001455

Application/Control Number: 13/398,641

Page 6

Art Unit: 2115

| | |
|---|---|
| frequency of at least the communication bus in response to determining the first processing element workload indicates the first processing element is a performance bottle neck and determining the communication bus is not able to accommodate the bus workload. | |
| 10. A method for efficient energy consumption comprising: determining a processing workload activity for a central processor on a package; determining a graphics workload activity for a graphics processor on the package; determining a bus workload activity for a communication bus on the package; determining if the package has reached a thermal or power limit; and in response to determining the package has reached the thermal or power limit, dynamically balancing power between the central processor, the graphics processor, and the communication bus based on at least the graphics workload activity and the bus workload activity. | 16. A method for efficient energy consumption comprising: determining a processing workload activity for a central processor on a package; determining a graphics workload activity for a graphics processor on the package; determining if the package has reached a thermal or power limit; and in response to determining the package has reached the thermal or power limit, determining if the central processor or the graphics processor is a performance bottleneck based at least on the graphics workload activity, setting a processor performance limit for the central processor below a previous processor performance limit in response to determining the graphics processor is the performance bottleneck, and setting a graphics performance limit for the graphics processor below a previous graphics processor performance limit in response to determining the central processor is the performance bottleneck. |

9.      Claim 1 of the co-pending application discloses all of the limitations of the instant application except for the limitations regarding a bus and monitoring the bus workload.

Evoy teaches monitoring the workload of a bus coupled to a core [col. 2 lines 21-38 and col. 1 line 42: processor bus]. Evoy's power saving and noise reduction method alters the frequency of a bus based on the utilization of the bus to run at an optimal power consumption and performance.

PUB_GOOGLE00001456

Application/Control Number: 13/398,641                                                              Page 7

Art Unit: 2115

It would have been obvious to one of ordinary skill in the art to combine claim 1

of the 13/327670 application with Evoy to achieve claim 1 of the instant application

because they both direct to a reduction of frequency of components for optimized

performance. Evoy's teaching of altering the frequency of a bus would allow a bus

connected to a core to reduce power consumption during low bus workloads. The

reduction of power consumption would allow for more resources to allocate to the cores

or vice versa, as described in claim 1 of the instant.

This is a provisional nonstatutory double patenting rejection.

### *Claim Rejections - 35 USC § 103*

10.    The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

11.    The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating

obviousness or nonobviousness.

PUB_GOOGLE00001457

Application/Control Number: 13/398,641                                                    Page 8

Art Unit: 2115

12.      **Claims 1, 3-6, and 9-13** are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Naffziger et al. (hereinafter as **Naffziger**) PGPUB 2008/0104428,

and further in view of **Evoy** USPAT 5,758,133.

13.      As per **claims 1 and 10**, Naffziger teaches an apparatus for efficient energy

consumption comprising: an integrated circuit [FIG. 1 module 100] including,

         a first core [FIG. 1 processor 1, 106];

         a core workload monitor configured to determine a core workload for the

first core [0013]; and

         balancing control adapted to dynamically tune power allocation on the first

core based on a power limit for the integrated circuit and at least the workload

[0013-0014].

Naffziger does not teach a communication bus coupled to the first core; a bus

workload monitor configured to determine a bus workload for the communication bus.

Specifically, Naffziger determines the workload of a first core and a second core and

allocates more frequency or power to the higher workload core while decreasing

frequency to the lower workload core to maintain an overall power consumption.

However, Naffziger does not explicitly teach a bus connected to a core or a method for

monitoring a bus workload.

         Evoy teaches a method for monitoring the workload of a bus coupled to a core

[col. 2 lines 21-38 and col. 1 line 42: processor bus]. Evoy's power saving and noise

reduction method alters the frequency of a bus based on the utilization of the bus to run

at an optimal power consumption and performance.

PUB_GOOGLE00001458

Application/Control Number: 13/398,641 Page 9
Art Unit: 2115

It would have been obvious to one of ordinary skill in the art to combine the

teachings of Naffziger and Evoy because they direct to changing the frequency of

components for optimized performance. Evoy's teaching of altering the frequency of a

bus would allow a bus connected to a core taught by Naffziger, to reduce power

consumption during low bus workloads. The reduction of power consumption in the bus

would allow Naffziger to allocate more frequency or power to the cores for optimal

performance.

Naffziger teaches:

[0013] The methods and devices described herein overcome the above described problems associated with fixed power allocations. **In summary, the processors 106, 108 indicate their processing requirements to the power manager 110, which monitors the power consumption of the entire module 100. The power manager 110 may then enable the processors 106, 108 to change their operating frequencies depending on the available power.** As an example, the total power available to the module 100 may be one hundred watts. The power manager 110 may, by default, allocate fifty watts to each processor. At one point, the first processor 106 may be relatively idle and may only use thirty watts during this idle period. Accordingly, the first processor 106 is operating at its optimal performance using only thirty watts. The second processor 108 may be executing a lot of code and may be operating at the frequency limit for its fifty watt allocation. **Accordingly, the second processor 108 is not operating optimally, but it could operate optimally if it could increase its operating frequency. In order to increase the operating frequency of the second processor 108, the power manager 110 may allocate power that would otherwise be used by the first processor 106 to the second processor 108. The second processor 108 may then increase its frequency to correspond to the increased available power.**

[0014] **The operating frequency of the first processor 106 is then limited because some of its power has been allocated to the second processor 108. Should the first processor 106 need to increase its operating frequency, it will have to do so by way of the power manager 110**. For example, the first processor 106 may send a signal or the like to the power manager 110 indicating that it needs to increase its operating frequency and,

PUB_GOOGLE00001459

Application/Control Number: 13/398,641                                                                Page 10

Art Unit: 2115

thus, needs to use more power. **The power manager 110 may then instruct the second processor 108 to reduce its power consumption or operating frequency so that power may be allocated to the first processor 106. The power allocation will shift between the processors 106, 108 until both processors are operating at the same fraction of optimal performance.** This fraction of optimal performance is sometimes referred to as optimability. It is noted that optimal performance is achieved when a processor is able to operate with the need to increase its operating frequency.

Evoy teaches:

[Col. 2 lines 21-38] In accordance with one embodiment of the present invention, **a method for altering a frequency of a bus based on utilization of the bus** is disclosed. **The method comprises the steps of: monitoring the bus for a predetermined number of clock cycles; lowering the frequency that the bus runs at if the bus is underutilized; and increasing the frequency that the bus runs at if the bus is at or near saturation**. The step of monitoring the bus may further comprise the steps of: clearing a clock cycle counter; clearing an idle bus counter; monitoring the bus during a clock cycle to determine if the bus is idle; increasing the clock cycle counter by one; increasing the idle bus counter by one if the bus was idle during the bus cycle; comparing the clock cycle counter to a preset clock cycle number; monitoring the bus during a next clock cycle for idleness if the clock cycle counter is not equal to the preset clock cycle number; comparing the idle bus counter to a preset idle bus number to determine if the bus was underutilized, nearing saturation or at saturation.

14.    As per **claim 3, <u>Evoy</u>** teaches the apparatus of claim 1, wherein a core workload monitor configured to determine the core workload for the first core includes first hardware to track a first number of cycles the first core is active during a period of time [col. 3 lines 10-23].

15.    As per **claim 4, <u>Evoy</u>** teaches the apparatus of claim 1, wherein the balancing control adapted to dynamically tune power allocation between the first core and the communication bus based on a power limit for the integrated circuit and at least the bus

PUB_GOOGLE00001460

Application/Control Number: 13/398,641                                        Page 11
Art Unit: 2115

workload comprises the balancing control, in response to the integrated circuit operating

at the power limit, being adapted to:

increase frequency for communication bus and cap frequency for the first

core in response to the bus workload being greater than a bus workload

threshold [col. 2 lines 26-27 and col. 3 lines 29-32] and

decrease frequency for the communication bus and increase the cap

frequency for the first core in response to the bus workload being less than the

bus workload threshold [col. 2 lines 25-26 and col. 3 lines 25-28].

16.     As per **claim 5**, **Naffziger** teaches the apparatus of claim 1, the balancing control

is further adapted to implement a low frequency limit for the communication bus [0018].

17.     As per **claim 6, Naffziger** teaches increasing a previous cap on bus frequency of

at least the communication bus in response to determining the first processing element

workload indicates the first processing element is a performance bottle neck and

determining the communication bus is not able to accommodate the bus workload

[0018]. The remainder of claim 6 is rejected on similar grounds as to claim 1.

18.     As per **claim 9**, **Naffziger** teaches the non-transitory medium of claim 6, wherein

the limit includes a thermal design power limit [0008: limited amount of power].

19.     As per **claim 11, Naffziger and Evoy** teach the method of claim 10, wherein

dynamically balancing power between the central processor, the graphics processor,

and the communication bus based on at least the graphics workload activity and the bus

workload activity comprises:

PUB_GOOGLE00001461

Application/Control Number: 13/398,641                                     Page 12

Art Unit: 2115

> determining if the graphics workload activity is greater than a graphics activity threshold [Naffziger 0013];

> determining if there is sufficient room on the communication bus based on the bus workload activity in response to determining the graphics workload activity is greater than a threshold [Naffziger 0013 and Evoy col. 2 lines 25-26 and col. 3 lines 25-28]; and

> increasing a maximum allowed frequency for the communication bus in response to determining there is not sufficient room on the communication bus [Evoy col. 2 lines 26-27 and col. 3 lines 29-32]; and

> decreasing a maximum allowed frequency for the communication bus in response to determining there is sufficient room on the communication bus [Evoy col. 2 lines 25-26 and col. 3 lines 25-28].

20.    As per **claims 12 and 13**, **Evoy** teaches the method of claims 10 and 11, wherein the method is performed in response to execution of privileged level power service code [col. 3 lines 11-32[1]].

21.    **Claims 2 and 7-8** are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Naffziger et al. (hereinafter as **Naffziger**) PGPUB 2008/0104428 in view of **Evoy** USPAT 5,758,133, and further in view of Borkar et al. (hereinafter as **Borkar**) PHPUB 2007/0074011.

22.    As per **claim 2 and 7**, Naffziger and Evoy teach the apparatus of claim 1, further comprising a second core [FIG. 1 processor 2, 108] and a workload monitor configured

---

[1] Privileged level power service code refers to tracking active cycles during period of measurements. Evoy tracks active cycles during a period of monitoring.

Application/Control Number: 13/398,641                                    Page 13

Art Unit: 2115

to determine a second core workload for the second core [Naffziger 0013], wherein the

first core includes a host processing core [Naffziger 0006], the second core includes a

graphics processing core [Naffziger 0006[2]], and wherein the balancing control is further

adapted to dynamically tune power allocation between the first core, the second core,

and the communication bus based on a power limit for the integrated circuit and at least

the bus workload, the core workload, and the second core workload [Naffziger 0013-

0014 and Evoy Col. 2 lines 21-38].

Naffziger and Evoy do not teach a second core workload monitor or the

communication bus includes a ring interconnect. Naffziger monitors the workload of

processors through a single power manager, but it would have been obvious to one of

ordinary skill in the art to have dedicated workload monitors for each core. Evoy teaches

a communication bus but does not specify that the communication bus is a ringed

interconnect.

Borkar teaches another power optimization system utilizing an interconnect to

link a plurality of cores for fast communication and redistribution of tasks to cores

[0018]. Borkar teaches a ringed interconnect which is also linked to system memory

[FIG. 7 interconnect 710] [0039].

It would have been obvious to one of ordinary skill in the art to combine the

teachings of Naffziger, Evoy, and Borkar because they direct to achieving optimized

performance while maintaining a power consumption level. Borkar's teaching of an

interconnect linking a plurality of cores for redistribution of tasks would allow the

---

[2] Processors have cores. Naffziger also states that the die could be any device or circuits, but they are referred to as processors. Therefore, asymmetric processors or cores of any type using Naffziger's power management techniques are anticipated by Naffziger.

Application/Control Number: 13/398,641                                      Page 14

Art Unit: 2115

combination of Naffziger and Evoy to reallocate the workload of cores and perform

frequency adjustments less often, which would save on power for computations and

transitioning.

Borkar teaches:

[0018] Once a dynamic profile has been created for each core, cores in a many-core processor may be grouped into different bins according to their characteristics. For example, cores with high maximum operating frequency may be labeled as fast cores; cores with low power consumption may be labeled as low power consumption cores; cores with good trending information may be labeled as reliable cores; etc. Based on dynamic profiles and the grouping information, the operating system ("OS") or an intermediate software layer may allocate a task to those cores that are most suitable for the task. For example, if the task requires intensive computation, the task may be assigned to fast cores. **Once certain cores are selected for the task, the interconnect fabric in the many-core processor may be reconfigured to ensure a high level of connectivity among the selected cores so that an at least acceptable bandwidth and latency across the selected cores may be achieved.** Additionally, the OS may re-allocate cores to a task in response to changes in the environment and the interconnect fabric may be re-configured accordingly.

[0039] FIG. 7 shows yet another example computing system 700 where a many-core processor may be used. In system 700, **system interconnect 710** that connects multiple processors (e.g., 720A, 720B, 720C, and 720D) is a links-based point-to-point connection. **Each processor may connect to the system interconnect** through a links hub (e.g., 730A, 730B, 730C, and 730D). I**n some embodiments, a links hub may be colocated with a memory controller, which coordinates traffic to/from a system memory. One or more processor may have many cores. The many core processor(s) may have a dynamic profiling apparatus to build a dynamic profile for each core**. Dynamic profiles may be built through periodic testing initiated by the dynamic profiling apparatus itself or through tests initiated by the OS. Each dynamic profile may include information on a core's maximum operating frequency, power consumption, power leakage, functional correctness, and other parameters. The dynamic profile may also include the trending information of these parameters.

PUB_GOOGLE00001464

Application/Control Number: 13/398,641                                             Page 15
Art Unit: 2115

23.    As per **claim 8**, <u>**Naffziger**</u> teaches causing the machine to perform the
operations of:

increasing a previous cap on frequency for one or more processor core in
response to determining the one or more graphics cores is not a performance
bottleneck [0014];

capping frequency for the one or more processor cores in response to
determining the first processing element workload indicates the first processing
element is a performance bottle neck and determining the communication bus is
able to accommodate the bus workload [0018].


### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to applicant's
disclosure. Applicant is reminded that in amending in response to a rejection of claims,
the patentable novelty must be clearly shown in view of the state of the art disclosed by
the references cited and the objections made. Applicant must also show how the
amendments avoid such references and objections. See 37 CFR §1.111(c).

24.    Ananthakrishnan et al. (2013/0061064) dynamically allocates frequency to
different domains of a processor to meet a power budget.

25.    Burchard et al. (PGPUB 2011/0113274) teaches changing the operating
frequency of a system on chip device to meet a workload.

26.    Burchard et al. (USPAT 8,185,215) teaches determining the workload of an
electronic device.

PUB_GOOGLE00001465

Application/Control Number: 13/398,641                                    Page 16
Art Unit: 2115

27.    Lint et al. (PGPUB 2006/0069936) adjusts the performances of processors based on received power management requests.

28.    Gupta (PGPUB 2004/0121797) teaches an embodiment where the frequency of one processor is increased and the frequency of another processor is reduced.

29.    Donovan (USPAT 8,281,170) determines the frequency of a bus based on the number of outstanding requests.


Any inquiry concerning this communication or earlier communications from the examiner should be directed to DANNY CHAN whose telephone number is (571)270-5134.  The examiner can normally be reached on Monday-Friday, 8AM-5PM EST.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Thomas C. Lee can be reached on 5712723667.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

PUB_GOOGLE00001466

Application/Control Number: 13/398,641                                          Page 17
Art Unit: 2115


/DANNY  CHAN/
Examiner, Art Unit 2115


                                        /Thomas  Lee/
                                        Supervisory Patent Examiner, Art Unit 2115

PUB_GOOGLE00001467