# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

|  |  |
|---|---|
| DAEDALUS PRIME LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>GOOGLE, LLC,<br><br>    *Defendant*. | Civil Action No. 7:25-cv-00313-DC-CTG<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF DAEDALUS PRIME LLC'S
## <u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD ........................................................................................ 2

III.   ARGUMENT.................................................................................................... 4

      A.    U.S. Patent No. 11,507,167, Claim 21, "interface unit" ......................................... 4

      B.    U.S. Patent No. 10,372,197, Claims 1-6, 8-16, 18, "energy performance bias (EPB) value" ..................................................................................... 7

           1.    The claims and specification do not require that the energy performance bias (EPB) value originate from a human user........................................................ 8

           2.    The '197 Patent writes in terms of optimization, not "savings.".................. 10

           3.    The prosecution history does not compel Google's construction.................. 11

           4.    Google's extrinsic evidence confirms Daedalus's construction..................... 13

      C.    U.S. Patent No. 10,372,197 (the "'197 Patent"), Claims 1-2, "workload configuration input," Claim 15, "workload configuration value" ........................ 14

      D.    U.S. Patent No. 8,898,494 (the "'494 Patent"), Claims 1-2, 8-9, 12, 16, "dynamically tune power allocation" / "dynamically balancing power".............. 17

           1.    The claims themselves do not require either of Google's restrictions........... 18

           2.    The specification does not support Google's construction. ........................... 20

           3.    The remaining intrinsic evidence does not demand Google's construction. . 22

      E.    U.S. Patent No. 8,775,833 (the "'833 Patent"), Claims 15-18, U.S. Patent No. 10,372,197 ("the '197 Patent"), claims 2-3, 5-7, 9-10, 15-16, 18-20, "is to"....... 25

           1.    *IPXL* does not apply: the claims do not require human user actions............. 25

           2.    The claims at issue recite a structural component having the capability to perform a stated function. ........................................................... 26

           3.    Google's attempts to distinguish the capability case law are unavailing....... 29

IV.   CONCLUSION................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013)........................................................................................3, 12

*ACME Worldwide Enters., Inc. v. United States*,
  146 Fed. Cl. 341 (Fed. Cl. 2019),
  *reh'g denied*, 147 Fed. Cl. 654 (Fed. Cl. 2020).......................................................................19

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
  672 F.3d 1335 (Fed. Cir. 2012)............................................................................................30

*Aylus Networks, Inc. v. Apple Inc.*,
  856 F.3d 1353 (Fed. Cir. 2017)............................................................................................23

*Bandspeed LLC v. Realtek Semiconductor Corp.*,
  No. 1:20-CV-765-DAE, 2023 WL 11915723 (W.D. Tex. Aug. 11, 2023).............................24

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
  895 F.3d 1374 (Fed. Cir. 2018).........................................................................................7, 16

*Comark Commc'ns, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998)............................................................................................10

*Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*,
  No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015)............................................26

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009)........................................................................................11, 22

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*,
  192 F.3d 973 (Fed. Cir. 1999)..............................................................................................24

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*,
  156 F.4th 1259 (Fed. Cir. 2025) .............................................................................................2

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014)..........................................................................................3, 6

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
  29 F.4th 1365 (Fed. Cir. 2022) ........................................................................................11, 22

*Grace Instrument Industries, LLC v. Chandler Instruments Co.*,
  57 F.4th 1001 (Fed. Cir. 2023) .............................................................................................16

*H-W Technology, L.C. v. Overstock.com, Inc.*,
   758 F.3d 1329 (Fed. Cir. 2014)..............................................................................................26

*Haggart v. Woodley*,
   809 F.3d 1336 (Fed. Cir. 2016)..............................................................................................23

*Intervet Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010)................................................................................................9

*Inverness Medical Switzerland GmbH v. Warner Lambert Co.*,
   309 F.3d 1373 (Fed. Cir. 2002)..............................................................................................24

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)...........................................................................25, 27, 28, 29

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999)..................................................................................................5

*In re Katz Interactive Call Processing Patent Litigation*,
   639 F.3d 1303 (Fed. Cir. 2011)...................................................................................25, 28, 29

*Lecat's Ventriloscope v. MT Tool & Manufacturing*,
   351 F. Supp. 3d 1100 (N.D. Ill. 2018) ...................................................................................26

*Maquet Cardiovascular LLC v. Abiomed Inc.*,
   131 F.4th 1330 (Fed. Cir. 2025) ............................................................................................23

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996)..................................................................................................................2

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)....................................................................................................2

*MasterMine Software, Inc. v. Microsoft Corp.*,
   874 F.3d 1307 (Fed. Cir. 2017)...................................................................................28, 29, 30

*Mems Tech. Berhad v. ITC*,
   447 F. App'x 142 (Fed. Cir. 2011) ...........................................................................................5

*Meta Platforms, Inc. v. AlmondNet, Inc.*,
   IPR2022-01064, 2023 WL 8243727 (P.T.A.B. Nov. 28, 2023)..............................................12

*Metacluster LT, UAB v. Bright Data Ltd.*,
   IPR2022-00687, 2023 WL 6812362 (P.T.A.B. Oct. 4, 2023) .................................................12

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008).................................................................................................27

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)..............................................................................................4

*Nikon Corp. v. Optimum Imaging Techs., LLC*,
    IPR2024-01372, 2025 WL 1180222 (P.T.A.B. Apr. 23, 2025)..............................................23

*ParkerVision, Inc. v. Qualcomm Inc.*,
    903 F.3d 1354 (Fed. Cir. 2018).............................................................................27, 29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................ *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999).............................................................................13

*Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*,
    No. 1:22-CV-973-RP, 2025 WL 2525457 (W.D. Tex. Mar. 10, 2025)....................................2

*Power Integrations, Inc. v. Lee*,
    797 F.3d 1318 (Fed. Cir. 2015)..............................................................................5

*Proxense, LLC v. Microsoft Corp.*,
    No. W-23-CV-00319-ADA, 2024 WL 2703020 (W.D. Tex. May 24, 2024) ...............2, 12, 17

*Reed v. City of Arlington*,
    650 F.3d 571 (5th Cir. 2011) ................................................................................23

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)..............................................................................16

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017)...........................................................................4, 25

*Sprint Commc'ns Co. v. Cox Commc'ns Inc.*,
    302 F. Supp. 3d 597 (D. Del. 2017)........................................................................6

*Tandon Corp. v. ITC*,
    831 F.2d 1017 (Fed. Cir. 1987)...........................................................................9, 15

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)........................................................................ *passim*

*ThroughPuter, Inc. v. Amazon Web Servs., Inc.*,
    No. 1:22-CV-1095-DAE, 2025 WL 2946606 (W.D. Tex. Sept. 9, 2025)................................2

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
    593 F.3d 1346 (Fed. Cir. 2010).............................................................................23

*UltimatePointer, L.L.C. v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016) ......................................................................................28, 29

**Statutes**

35 U.S.C. § 101 .............................................................................................................11, 12

35 U.S.C. § 112 ¶2 (2010) .................................................................................................3, 25

**Other Authorities**

Oxford English Dictionary ...............................................................................................20, 29

## I.    INTRODUCTION

Google's Opening Claim Construction Brief ("Def.'s Br.," Dkt. 65) asks this Court to adopt constructions that would improperly narrow clear claim language, import limitations from preferred embodiments into the claims, and invalidate well-understood functional language that the Federal Circuit has repeatedly upheld. Each of Google's proposals should be rejected.

For the four terms requiring specific construction, Google's strategy repeatedly selects the same approach: take language the patent uses broadly, find the specification's most detailed embodiment, and argue that embodiment is the claim. That approach directly contravenes the Federal Circuit's directives "repeatedly warn[ing] against confining the claims" to "very specific embodiments of the invention," and "expressly reject[ing] the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (collecting cases).

For its indefiniteness challenge to "is to," Google asks this Court to hold multiple dependent claims of two patents invalid for using a common claim-drafting convention that the Federal Circuit has endorsed in analogous formulations across decades of precedent. The phrase "is to" describes a structural component's capability, no different from "configured to," "adapted to," or bare active verbs like "presents," "receives," and "generates," that the Federal Circuit has expressly upheld. A person of ordinary skill in the art would have no difficulty understanding what the claims require.

Daedalus Prime LLC ("Daedalus" or "Plaintiff") respectfully requests that the Court reject Google's proposed constructions and adopt Daedalus's constructions, which faithfully track the claim language and intrinsic record.

## II.    LEGAL STANDARD

Claim construction is a matter of law "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The words of a claim "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (internal quotations and citations omitted). In construing patent claims, courts should start with the language of the claims themselves, giving terms "their ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. Claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). Courts "should also consider the patent's prosecution history" in construing claim terms. *Phillips*, 415 F.3d at 1317 (internal citation omitted). The claim language, specification, and prosecution history constitute the intrinsic evidence.

The Federal Circuit applies a "heavy presumption that claim terms carry their full ordinary and customary meaning." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1273 (Fed. Cir. 2025) (internal quotation and citation omitted); *accord Proxense, LLC v. Microsoft Corp.*, No. W-23-CV-00319-ADA, 2024 WL 2703020, at *1 (W.D. Tex. May 24, 2024). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also, e.g.*, *ThroughPuter, Inc. v. Amazon Web Servs., Inc.*, No. 1:22-CV-1095-DAE, 2025 WL 2946606, at *2 (W.D. Tex. Sept. 9, 2025) (citing *Thorner*); *Polaris PowerLED Techs., LLC v. Dell Techs., Inc.*, No. 1:22-CV-973-RP, 2025 WL 2525457, at *2 (W.D. Tex. Mar. 10, 2025) (citing *Thorner*); *Proxense*, 2024 WL 2703020, at *1 (citing *Thorner*). "The standards

for finding lexicography and disavowal are exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). To act as a lexicographer, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments"; instead, a patentee "must clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation and citation omitted). To provide a clear disavowal of claim scope, a patentee "may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction . . . ." *Id.* at 1366 (citation omitted). "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Id.* (citations omitted). "It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Id.* "We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that." *Id.* When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Courts may also consider "extrinsic evidence," including expert testimony, dictionaries, and learned treatises, to better understand the technical field and understand what a person of skill in the art would understand claim terms to mean. *See Phillips*, 415 F.3d at 1317. Extrinsic evidence is of less significance than the intrinsic record, *see id.* at 1317–24, and it may not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

Pre-AIA 35 U.S.C. § 112 ¶2 (2010) requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." This provision requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the

invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). The party asserting invalidity must prove indefiniteness by clear and convincing evidence. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.    ARGUMENT

For the Court's and the parties' convenience, Plaintiff Daedalus addresses the claim terms in the order set forth in Google's opening brief rather than in the order set by the OGP.

### A.    U.S. Patent No. 11,507,167, Claim 21, "interface unit"

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Google |
|---|---|---|---|
| "interface unit" | '167 patent, claim 21 | Plain and ordinary meaning | "Circuitry of a multicore processor that interconnects the cores to other circuitry" |

U.S. Patent No. 11,507,167 (the "'167 Patent" or "'167 Pat.," Dkt. 1-5; *also* Dkt. 65-5) generally relates to a multicore processor that uses multi-staged voltage ramping when waking cores from an inactive state to an operating voltage. As an example, the '167 Patent explains that rather than immediately jumping to a target voltage, a core can be first stepped to an interim voltage, then increased to the target voltage. *See, e.g.*, '167 Pat., Abstract. The '167 Patent describes and claims various elaborations of multi-staged ramping in a multicore processor. *See, e.g., id.*, claim 14. In this lawsuit, Google seeks to construe only the term "interface unit" in claim 21.

Dependent claim 21 recites "wherein the first plurality of cores and second plurality of cores are further coupled to an ***interface unit***" (emphasis added). This is the only '167 Patent claim reciting an "interface," "interface unit," or "interconnect," so there is no reason in the claim language to differentiate this "interface unit" from any other kind of interface or interconnect. A person of ordinary skill in the art would therefore understand "interface unit" to have its plain and ordinary meaning, consistent with an interface or interconnect.

In the specification, the patentee deployed each of "interface," "interface unit," and "interconnect" as broad, unqualified terms, not as shorthand for a single architectural configuration. It repeatedly describes multiple types of interfaces, interface units, and interconnects.[1] Yet the construction Google advances—"[c]ircuitry of a multicore processor that interconnects the cores to other circuitry"—departs from, and impermissibly narrows, this term's ordinary meaning by requiring the "interface unit" to be (1) "circuitry of a multicore processor" that (2) specifically "interconnects the cores to other circuitry" (Def.'s Br. at 7), thereby excluding entire categories of interfaces recognized in the specification and in the art.

Google's claim language argument for its construction rests on the phrase "coupled to," which Google suggests requires on-chip location to enable direct coupling to the cores and the power control unit. *See* Def.'s Br. at 7–8. Contrary to Google's implicit contention, however, courts have frequently held that a patent claim which recites "coupled to" or "coupling" does not require direct coupling. *See, e.g.*, *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323–25 (Fed. Cir. 2015); *Mems Tech. Berhad v. ITC*, 447 F. App'x 142, 151–52 (Fed. Cir. 2011); *Johnson Worldwide*

---

[1] Examples include "an input/output interface 132" that "may be in accordance with the Intel® Quick Path Interconnect (QPI) protocol" ('167 Pat., 3:4–5, 8–9), "another interface 134" that "may be in accordance with a [PCIe] specification" (*id.*, 3:5, 12–14); a "power control unit (PCU)" that "may be coupled via a dedicated interface to external voltage regulator 160" (*id.*, 3:16, 23–24), an "Advanced Configuration and Platform Interface (ACPI) standard" (*id.*, 3:63–64), "FSMs 230 [that] also enable an interface between PCU 200 and other components of a processor" (*id.*, 5:21–23), "an interface 515 such as a bus interface unit to enable interconnection to additional circuitry of the processor" (*id.*, 11:44–46), "one or more interfaces 580 such as a PCIe™ interface to enable communication with one or more offchip devices" (*id.*, 12:33–35), "various cores may be coupled via an interconnect 615 to a system agent or uncore 620 that includes various components" (*id.*, 12:47–49), "various interfaces 650" (*id.*, 12:52), "display controller 752 which may provide control of and an interface to an associated display" (*id.*, 13:44–45), "integrated memory controller (IMC) 770 that can provide for an interface to a system memory" (*id.*, 13:55–56), "[m]ultiple interfaces 7800-7800 [that] may be present to enable interconnection between the processor and other circuitry" (*id.*, 13:57–59), "point-to-point (P-P) interfaces 876 and 878" (*id.*, 14:19–20), "P-P interconnects 862 and 864" (*id.*, 14:27–28), and "an interface 892 to couple chipset 890 with a high performance graphics engine 838" (*id.*, 14:30–32).

*Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 992 (Fed. Cir. 1999). Google itself concedes that "'coupled to,' viewed in isolation, does not by itself resolve whether the interface unit is on-chip or off-chip." Def.'s Br. at 7.

Rather than accept its concession that the claim language does not demand a departure from plain and ordinary meaning, Google fills the gap with structural inferences drawn from the '167 Patent specification. Google's construction rests heavily on a single specification passage: "As further shown, each core unit 510 includes an interface 515 *such as* a bus interface unit to enable interconnection to additional circuitry of the processor." '167 Pat., 11:43–46 (emphasis added). Notably, the specification describes a "*bus* interface unit," not the claimed "interface unit." And it uses the significant phrase "such as"—identifying the bus interface unit as one example among others, not as an exhaustive definition. The Federal Circuit has consistently held that exemplary language in the specification does not limit claim scope. *See, e.g.*, *Phillips*, 415 F.3d at 1323 (collecting cases). "The phrase 'such as' is commonly used in patents to identify non-limiting examples." *Sprint Commc'ns Co. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 617 (D. Del. 2017). Its usage here once again falls well short of the standards for finding either lexicography or disavowal. *See Thorner*, 669 F.3d at 1365–66; *GE Lighting*, 750 F.3d at 1309.

In an attempt to save its construction, Google argues (Def.'s Br. at 8–10) that Figure 7's depiction of "interface unit 515" (shown within the core unit) as distinct from "interface 580" (external) supports its narrow construction. This argument collapses under scrutiny. The specification uses "interface," "interface unit," and "interconnect" as similar terms in various embodiments. *See supra* note 1. The description of "interconnect 615" shown in Figure 8, for example, does not make any distinction between an "interconnect," "interface," or "interface unit." *See* '167 Pat., 12:47–49. Claim 21, by contrast, employs only "interface unit" without the structural qualifiers

that Google drags from Figure 7's architecture. The specification also uses "interface unit" generically at 2:56–58: "In an embodiment, each core unit may include multiple cores, a cache memory, an interface unit *and so forth*" (emphasis added). The phrase "and so forth" shows this is a non-exhaustive listing of core unit components, including a generic "interface unit," not a technical definition limiting "interface unit" to interface 515's specific architecture. The specification entirely lacks any kind of statement about "the present invention" or "an essential element" that would limit the scope of the "interface unit" in dependent claim 21. *See Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1377 (Fed. Cir. 2018) (holding that specification which provided a list of fasteners ending in "etc." was non-limiting) (collecting cases).

Accordingly, the Court should reject Google's construction and should construe "interface unit" to have its plain and ordinary meaning.

**B.      U.S. Patent No. 10,372,197, Claims 1-6, 8-16, 18, "energy performance bias (EPB) value"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Google |
|---|---|---|---|
| "energy performance bias (EPB) value" | '197 patent, claims 1-6, 8-16, 18 | Plain and ordinary meaning, in which the plain and ordinary meaning is "a value influencing a tradeoff between power optimization and performance optimization" | "A value indicating a user's preference for a tradeoff between power savings and performance" |

U.S. Patent No. 10,372,197 (the "'197 Patent" or "'197 Pat.," Dkt. 1-3; *also* Dkt. 65-4) generally relates to controlling power management features of a processor having a core and a power controller. '197 Pat., Abstract. Generally speaking, the patent explains that the power controller can receive an energy performance bias (EPB) value from the core, access a power-performance tuning table, and update at least one setting of a power management feature. *See id.*

Google seeks to construe "energy performance bias (EPB) value."[2] Daedalus submits that this term can be construed to have its plain and ordinary meaning—a value biasing energy performance—or, if the Court determines that more detail will aid the jury, as a value influencing a tradeoff between power optimization and performance optimization.

Google's proposal to construe "energy performance bias (EPB) value" as "[a] value indicating a user's preference for a tradeoff between power savings and performance" makes two significant, unsupported alterations to the intrinsic record. It inserts a requirement that the value indicate "a user's preference," and it substitutes "power savings" for the '197 Patent's own language of "power optimization." Both changes must be rejected.

1.   <u>The claims and specification do not require that the energy performance bias (EPB) value originate from a human user.</u>

Google emphasizes the specification's scattered references to "user" control (Def.'s Br. at 11–12), but the claims themselves contain no such limitation.

Independent claim 1 recites a "tuning circuit to receive a workload configuration input regarding a workload, receive a plurality of energy performance bias (EPB) values and determine a global EPB value based thereon." '197 Pat., 11:56–59. Notably, the claim does not specify who or what provides those values. Similarly, independent claim 15 recites "a tuning circuit to dynamically select a balance between power consumption and performance based on an energy performance bias (EPB) value, wherein the tuning circuit is to access an entry of a tuning table based at least in part on the EPB value and a workload configuration value," also without specifying who or what provides these values. *Id.*, 13:6–11. Independent claim 11 includes language referencing

---

[2] Tables in Google's brief assert that the disputed claim term is "EPB value." Def.'s Br. at 5, 10. Plaintiff disagrees. The claim term which Google identified for construction, which the parties discussed in their claim construction disclosures and at their meet-and-confer, and which appears in independent claims 1, 11, and 15, is "energy performance bias (EPB) value." *See, e.g.*, Ex. A.

"a preference of a user for a tradeoff between power optimization and performance optimization" (*id.*, 12:44–46), but the words "user" and "preference" appear only in claim 11 and its dependents, not in independent claims 1 or 15 or their dependents. Under the doctrine of claim differentiation, importing claim 11's "user" and "preference" limitations into independent claims 1 and 15 would improperly collapse the distinction between claims and violate the presumption that each claim differs in scope. *See, e.g.*, *Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.").

Google cites *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010), for the proposition that a purportedly idiosyncratic term like energy performance bias value is "best understood by reference to the specification." Def.'s Br. at 11. But *Intervet* actually cuts against Google because the court held that claims are not limited to their disclosed embodiments absent clear indication in the intrinsic evidence. *See* 617 F.3d at 1287 (finding that examples in specification "are representative species of the larger . . . genus, where the genus is identified and claimed as the invention"). In any event, the '197 Patent specification expressly reveals that energy performance bias (EPB) values may emanate from multiple sources beyond direct human input. As the specification explains,

> the provision of the EPB value can be from a variety of external entities including but not limited to an operating system (OS), a basic input/output system (BIOS), an external embedded controller of a platform such as a baseboard management controller (BMC), a data center central management software and communicated via a network and a node manager device or so forth to a platform, among others, automatically or via a user.

- 9 -

'197 Pat., 2:54–61. Indeed, the "EPB input can be provided by an operating system (OS) or by system basic input/output system (BIOS), or even by a user level application directly or indirectly." *Id.*, 4:32–34. In fact, "in some embodiments, ***the end user may be prevented*** from such individual control." *Id.*, 2:61–63 (emphasis added). The specification's description of user input as just one source of EPB values, alongside OS, BIOS, and BMC sources, and its explicit observation that end user input may be prohibited, represents precisely the opposite of a clear indication that only user-provided preferences values fall within the scope of the claim term. *See Thorner*, 669 F.3d at 1365–67.

2.    The '197 Patent writes in terms of optimization, not "savings."

Google surreptitiously substitutes "power savings" for the patent's own language of "power optimization." Def.'s Br. at 12–13. This is no mere semantic quibble. "Power optimization" is conceptually broader than "power savings." It encompasses optimizing how power is distributed, allocated, and managed across the system, not merely reducing total power consumption. Although Google's construction relies on language in Claim 11 which recites "a preference of a user," Google ignores that this same claim also recites that this preference is "for a tradeoff between power optimization and performance optimization." '197 Pat., 12:44–46. Google's construction would be contrary to the plain language of the claim and is impermissible. *See Thorner*, 669 F.3d at 1366 ("[W]e do not redefine words."); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself.").

The specification also does not restrict any tradeoff to solely involve "power savings" and "performance." It instead speaks about power more generally, stating that "any power management technology involves a power/performance tradeoff" ('197 Pat., 1:47–48), "[e]ach power management feature is specifically tuned in design to achieve an optimal power/performance tradeoff."

- 10 -

(*id.*, 1:53–55), that there is often "no choice regarding power/performance tradeoffs, other than default profiles provided by an operating system (OS)" (*id.*, 1:67–2:1), that the inventions are "not limited to physical computing devices, but may also relate to software optimizations for energy conservation and efficiency" (*id.*, 4:5–8), and, for an embodiment, that individual power management features may be tuned by "generating a power/performance profile across a range of workloads for each feature" and that "multiple features can be enabled to a profile whether the power/performance tradeoff met the tuning goals for overall power/performance profile" (*id.*, 8:44–49). If the Court decides that the plain and ordinary meaning of this term needs any explanation, the concepts of "power optimization" and "performance optimization" best fit the claims and specification.

### 3. The prosecution history does not compel Google's construction.

Google next points to statements the applicant made during prosecution to overcome a 35 U.S.C. § 101 rejection, arguing that "the applicant surrendered claim scope." Def.'s Br. at 13–14. But "the applicant disclaimed protection during prosecution only if the allegedly disclaiming statements constitute a clear and unmistakable surrender of subject matter." *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (internal quotation and citation omitted). That is, the statements "must be so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (internal quotations and citation omitted). No such "clear and unmistakable" surrender of claim scope occurred here.

Instead of describing "the invention," the applicant's statements merely illustrated the patent eligibility of some of the embodiments in the '197 Patent's specification:

> The Specification here describes benefits of a system that includes a tuning circuit to update a setting of at least one power management feature as described herein. Specifically, the Specification describes that an EPB value allows an end user to

control power/performance tradeoffs in a simple manner. Specification, paragraph 14. Stated another way, embodiments here and as expressed in the claims provide a manner to enable at least one setting of a power management feature to be updated even where a non-technical user has little or no understanding of an ability to tune such features. *Id.*, paragraph 15. As such, the Specification confirms that benefits are provided by way of the improvements in processor functionality disclosed in the Specification and recited in the claims.

Dkt. 65-6 at PUB_GOOGLE00001129–30. As an initial matter, because these statements are unconnected to any specific claim language and address only the general issue of subject-matter eligibility, they have no connection to this claim construction dispute and should be disregarded. *See Meta Platforms, Inc. v. AlmondNet, Inc.*, IPR2022-01064, 2023 WL 8243727, at *8 (P.T.A.B. Nov. 28, 2023) (holding that applicant's "prosecution history statements are not pertinent" to claim construction "because the statements address subject matter eligibility under § 101"); *Metacluster LT, UAB v. Bright Data Ltd.*, IPR2022-00687, 2023 WL 6812362, at *11 (P.T.A.B. Oct. 4, 2023) (finding no surrender when "applicant's statements addressed specific issues relating to patent eligibility" and "made no statements indicating disclaimer of the scope of the claim term").

In any event, the applicant's observation that in some embodiments "even . . . a non-technical user" could set power management features with "little or no understanding of an ability to tune such features" does not establish that **only** users provide EPB values. The applicant's statements do not repudiate the specification's express disclosure of OS, BIOS, and BMC-provided EPB values, *see* '197 Pat., 2:54–61, nor do they renounce the specification's observation that end user input may be prevented in other embodiments. *See id.*, 2:61–63. Because the "applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M*, 725 F.3d at 1326; *Proxense*, 2024 WL 2703020, at *1 (quoting *3M*). Accordingly, the prosecution history does not compel the adoption of Google's construction.

- 12 -

4.    Google's extrinsic evidence confirms Daedalus's construction.

Google points to Intel engineers' posts on the Linux kernel mailing list and Intel's SDM Manual as extrinsic evidence supporting its position. Def.'s Br. at 14–16. But even so, Google's evidence actually validates Daedalus's construction and confirms that it is consistent with "clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

Simply put, Google's own extrinsic evidence demolishes its narrow construction of "energy performance bias (EPB) value." The energy performance bias register described in these sources is set not only by users but also by operating system software and BIOS firmware, exactly as the specification explains. *See* Def.'s Br., Ex. F (Dkt. 66), at INTEL000138; *see also id.*, Exs. G, H, I (Dkts. 65-8, 65-9, 65-10). While Google's Exhibit G is a post by Intel engineer Len Brown on the Linux kernel mailing list describing a "utility to implement the user-space approach" for setting an energy performance bias register, the phrase "user-space" is a term of art referring to software running outside the kernel,[3] not to human user preferences; Brown uses "user-space" in direct opposition to the "kernel," and he states in a comment that the bias value allows "software to convey its policy" for a tradeoff between performance and energy consumption. *See* Dkt. 65-8 at GOOG-DPRIME-PA-00000161, -63. Google's Exhibit H, the corresponding GitHub commit, reinforces this critical point: the commit message states that the tool is designed so that "[m]ost systems would benefit from 'x86_energy_perf_policy normal' at system startup." Dkt. 65-9 at GOOG-DPRIME-PA-00000605. That is, the operating system sets and uses the EPB value at boot, not the end user. The commit clarifies that the utility "runs only as root," meaning it functions as

---

[3] *See also, e.g.*, Ex. B, § 6.3.5 (Intel Software Developer's Manual) at PUB_DPG00000165 & Fig. 6-3 (explaining how processor privilege levels distinguish between "the most critical code modules in the system, usually the kernel" and less-privileged levels for software such as device drivers and applications).

a system administration tool, not an end-user interface. *Id.* at GOOG-DPRIME-PA-00000609. Most tellingly, Google's Exhibit I (an Intel Software Developer's Manual) explicitly states that Intel processors may support an "additional ***software*** hint," and that "***[s]oftware*** can detect processor' capability to support performance-energy bias preference hint," "***[s]oftware*** can program the lowest four bits" of the bias hint, and "***[s]oftware*** can use whatever criteria it sees fit to program the MSR with the appropriate value." Dkt. 65-10 at GOOG-DPRIME-PA-00008040-41 (emphases added). The Manual says "software," not "the user." It permits "whatever criteria" the software employs, not merely user preferences. Google's own exhibits establish beyond question that EPB values are set by OS software, BIOS firmware, and system management controllers, exactly as the specification provides, not exclusively by human users.

Accordingly, the intrinsic and extrinsic record strongly supports construing "energy performance bias (EPB) value" to have its plain and ordinary meaning. If the Court desires additional clarity, that plain and ordinary meaning is "a value influencing a tradeoff between power optimization and performance optimization."

**C.    U.S. Patent No. 10,372,197 (the "'197 Patent"), Claims 1-2, "workload configuration input," Claim 15, "workload configuration value"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Google |
|---|---|---|---|
| "workload configuration input" | '197 patent, claims 1-2 | No construction necessary | "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g. non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive)" |
| "workload configuration value" | '197 Patent, claim 15 | | |

No construction of "workload configuration input" or "workload configuration value" in the '197 Patent is necessary. These terms possess readily understandable plain meanings: an input or value relating to the configuration of a workload. Google's proposed construction impermissibly

- 14 -

imports language from one independent claim into other independent claims, and it also imports specific examples from the specification into the claim terms. It should be wholly rejected.

Claim 1 recites a tuning circuit that receives "a workload configuration input regarding a workload." '197 Pat., 11:56–57. Independent claim 15 specifies a "workload configuration value," "wherein the workload configuration value is to indicate a predominant workload type to be executed on the system." *Id.*, 13:13–15. Google suggests that the "claim terms are normally used consistently throughout the patent" and that claim 15's language "illuminate[s] the meaning of the same term in other claims." Def.'s Br. at 16 (quoting *Phillips*, 415 F.3d at 1314). As an initial matter, these are not the "same" claim terms: one term is "workload configuration input" and the other is "workload configuration value." "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon*, 831 F.2d at 1023. Moreover, claims 1 and 15 are substantially different claims—for example, claim 15 recites multiple limitations regarding a "tuning table" and a "workload type" that are not present in claim 1— and there is simply no reason to narrow the "workload configuration input" of claim 1 by confining it to language recited in connection with a different term in claim 15. And there is no reason to construe "workload configuration value" in claim 15 when that claim already expressly recites "wherein the workload configuration value is to indicate a predominant workload type to be executed on the system."

Google's construction also embeds specific examples from the specification, including "NUMA," "UMA," and "I/O intensive," as hard limitations on the claim term. The specification explicitly presents these as exemplary: "***As examples***, a user can configure a workload input as non-uniform memory architecture (NUMA), uniform memory architecture (UMA), input/output (I/O) intensive, ***etc.***" '197 Pat., 7:3–6 (emphases added). Google's construction transforms open-

ended workload characterization into a rigid, enumerated taxonomy—the precise error *Phillips* forbids. *See* 415 F.3d at 1323. Indeed, *Phillips* itself held that a claim term, "baffles," was not limited to specific or preferred embodiments in the specification. *See id.* at 1324–27.

And the '197 specification's explicit use of "etc." following the NUMA, UMA, and I/O-intensive examples conclusively establishes that the list is exemplary and non-limiting. *See Blackbird*, 895 F.3d at 1377 (holding that specification which provided a list of fasteners ending in "etc." was non-limiting). These are merely descriptors, not a workload's "predominant pattern of execution" in the narrow sense Google proposes. After all, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of [the] invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

Taken as a whole, the '197 specification's disclosure falls far short of the clear and unmistakable surrender of claim scope required to find either lexicography or disavowal and depart from the claim terms' plain and ordinary meanings. "We do not read limitations from the specification into claims." *Thorner*, 669 F.3d at 1366. Google cites *Grace Instrument Industries, LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1010 (Fed. Cir. 2023), for the proposition that "a skilled artisan would understand that the specification's descriptions . . . adequately guide the skilled artisan to the meaning of [the term]." Def.'s Br. at 18. But *Grace* concerned a term, the "enlarged chamber" of a heart, whose meaning was sufficiently illuminated by the specification's descriptions to avoid indefiniteness. *See id.* at 1008–10. And the *Grace* court emphasized that a skilled artisan would understand the specification's descriptions of "corresponding embodiments" as guiding interpretation, rather than as defining an exhaustive list. *See id.* at 1010. When "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and

- 16 -

unmistakable." *Proxense*, 2024 WL 2703020, at *1 (quoting *3M*, 725 F.3d at 1326). The specification's express description of the embodiments as "examples," "etc." should control.

Consequently, the terms "workload configuration input" and "workload configuration value" do not need construction.

**D.    U.S. Patent No. 8,898,494 (the "'494 Patent"), Claims 1-2, 8-9, 12, 16, "dynamically tune power allocation" / "dynamically balancing power"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Google |
|---|---|---|---|
| "dynamically tune power allocation" | '494 Patent, claims 1-2, 12, 16 | Plain and ordinary meaning | "Adaptively increasing power for one component while concurrently reducing power to another component." |
| "dynamically balancing power" | '494 Patent, claims 8, 9 | | |

U.S. Patent No. 8,898,494 (the "'494 Patent" or "'494 Pat.," Dkt. 1-2; *also* Dkt. 65-3) generally relates to power budgeting on an integrated circuit to eliminate bottlenecks and achieve maximum overall performance. *See, e.g.*, '494 Pat., Title, Abstract, 3:15–30. Ignoring the Federal Circuit's directive that "we do not redefine words," *Thorner*, 669 F.3d at 1366, Google's construction attempts to rewrite the express language of two different claim recitals to have the same construction. Def.'s Br. at 19–24. Google's construction imposes two limitations that are not supported in the claims of the recitals it purports to construe: (1) a requirement of "concurrent[]" action, and (2) a mandate that one component's power must "increas[e]" while another's must "reduc[e]."

Google improperly motivates its analysis by beginning with the specification, claiming that the specification says the invention is restricted to certain embodiments. Def.'s Br. at 19–20. The specification says no such thing, and as Daedalus explains below, it discloses embodiments that directly contract Google's proposed construction. Google then moves to the Patent Office, asserting that statements made during *inter partes* review proceedings and during prosecution somehow limit the scope of the claims. Def.'s Br. at 20–22. As also explained below, they do not.

- 17 -

A jury would readily understand the existing claim recitals, and these claim terms should receive their plain and ordinary meaning. Daedalus begins, as *Phillips* directs, with the words of the claims, before turning to the specification and prosecution history. *See* 415 F.3d at 1314–17.

### 1. The claims themselves do not require either of Google's restrictions.

Google inserts the word "concurrently" into its construction, requiring that a power increase to one component occur simultaneously with a power decrease to another. The claims contain no such requirement. For example, claim 1 recites a processor comprising an integrated circuit having a "balancing control adapted to receive the bus workload from the bus workload monitor and to dynamically tune power allocation between the first core and the communication bus based on a power limit for the integrated circuit and a comparison between the bus workload and a bus workload threshold." '494 Pat., 21:28–33. The phrase "dynamically tune power allocation" describes runtime redistribution of power among components, nothing more.

Also, claim 1 does not require that anything be operating at a power limit, nor does it require opposing directions of "increasing power for one component while . . . reducing power to another component." The balancing control in claim 1 operates "based on a power limit." '494 Pat., 21:31. That is, it takes the power limit into account. But nothing in claim 1 requires that the claimed device must operate at the power limit or that every adjustment must be a zero-sum redistribution. Dependent claim 3, in contrast, specifically recites that the integrated circuit is "*operating at* the power limit," confirming that claim 1's recital of "based on a power limit" is broader. '494 Pat., 21:51–52 (emphasis added). The balancing control of claim 3 also is adapted to both "increase frequency for the communication bus and *cap*"—not decrease—"frequency for the first core in response to the bus workload being greater than the bus workload threshold" and "decrease frequency for the communication bus and increase the frequency for the first core in response to the bus workload being less than the bus workload threshold." *Id.*, 21:53–59 (emphasis added).

- 18 -

This recital shows, through claim differentiation, that the balancing control in claim 1 is broader than in claim 3 and lacks claim 3's counterweighing behavior. *See, e.g.*, *Phillips*, 415 F.3d 1303, 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim") (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)). More importantly, the offsetting behavior in dependent claim 3, in which one component's frequency may be ***capped*** while another component's frequency is increased, runs directly contrary to Google's construction.

> Claim 8 presents the same obstacles to Google's construction. It recites, *inter alia*,
>
> dynamically balancing power between the central processor, the graphics processor, and the communication bus based on at least the graphics workload activity and the bus workload activity, including adjusting a maximum allowed frequency for the communication bus by a plurality of steps and adjusting a maximum allowed frequency for the central processor by a step.

'494 Pat., 22:54–61. Nothing in claim 8 requires concurrency; the claim does not recite that "adjusting a maximum allowed frequency for the communication bus" and "adjusting a maximum allowed frequency" occur at the same time, at any particular time, or in any particular sequence. *See id.* Nor does claim 8's recital of "adjusting" require or suggest any directionality in those adjustments. Moreover, three components are subject to "dynamically balancing power": "the central processor, the graphics processor, and the communication bus." *Id.* But only two adjustments are recited in claim 8. *See id.* The claim says nothing about adjusting the graphics processor. *See id.*

For both claim terms, Google also replaces the express claim language "dynamically" with the word "adaptively." Google does not explain this change, which appears unnecessary. *See ACME Worldwide Enters., Inc. v. United States*, 146 Fed. Cl. 341, 347–50 (Fed. Cl. 2019) (declining to replace "dynamically" with "continuously" and finding that longer claim term had plain and ordinary meaning), *reh'g denied*, 147 Fed. Cl. 654, 657–60 (Fed. Cl. 2020). The Court should decline to entertain it.

2.      The specification does not support Google's construction.

Google repeatedly asserts that the specification describes the invention consistently with its preferred construction. Def.'s Br. at 19–20. Google is incorrect. The cited specification portions are merely exemplary and do not rise to the level of lexicography or disavowal that the Federal Circuit requires to limit the claims.  *See Thorner*, 669 F.3d at 1365–67. For example, col. 7:52–56 and col. 7:56–61 are not directed to the claimed invention as Google contends (Def.'s Br. at 20), but fall within a paragraph describing only "one embodiment." '494 Pat., 7:40. The specification repeatedly makes clear that such embodiments are only exemplary and illustrative and should not limit the claim scope. *See id.*, 2:32–3:14, 21:3–14.

Consistent with dictionary definitions that "dynamic" in a computing context as "[t]hat changes or that can be changed while a program or operating system is running; that can be specified or performed at run time, rather than in advance" (Ex. C (OED, "dynamic") at PUB_DPG00005406),[4] the '494 Patent describes a system that monitors workloads and adjusts power allocations at runtime, in response to workload conditions. Contrary to Google's assertion that the invention involves "increasing power to one component at the expense of another" (Def.'s Br. at 20), the specification provides for dynamic allocation to achieve maximum ***performance***. *See, e.g.*, '494 Pat., 3:15–17 ("The method and apparatus described herein are for balancing power between multiple asymmetric devices to achieve maximum overall performance."); *but see id.*, 3:21–22 ("Yet, the apparatuses and methods described herein are not so limited . . . ."). The specification reinforces this meaning throughout. For example:

---

[4] Google also quotes a single Oxford English Dictionary ("OED") definition of "balance" (Def.'s Br. at 23), but it relies on definition 1.8, a subordinate, derived sense that the OED itself introduces with the word "Hence." The OED's primary definitions tell the true story: "[t]o bring to or keep in equilibrium" (definition 1.4), "to poise, keep steady or erect" (definition 1.5), and "[t]o steady, give (mental) balance or ballast to" (definition 1.6). Def.'s Br., Ex. O (Dkt. 65-16) at GOOG-DPRIME-PA-00033360–62. None of these definitions mandate Google's construction.

- 20 -

> power control module 160 . . . is able to balance and allocate power/frequency between devices of IC 100 to achieve ***maximum performance***; even when IC 100 is under a power limit. Additionally, such allocation, in one scenario, is based on actual workload of devices, instead of assumptions of workload or power consumption.

'494 Pat., 7:40–47 (emphasis added). Also for example, "power module 520 is to dynamically balance performance between cores 505, 510 based on workload determination from workload module 515. Balancing 'performance' between cores includes modifying any metric or factor that affects core performance and/or power." *Id.*, 10:6–10. Indeed, "any number of balancing effects may be utilized," *id.*, 17:16–17, and "any methodology for dynamically allocating power between units/cores may be utilized to stay under a limit and maximize performance." *Id.*, 17:42–44. And "when a power limit exists and IC 100 is not up against the power limit, ***the immediately aforementioned increase in performance may not include a counterbalancing reduction*** in the other device." *Id.*, 8:30–33.

That last statement should be dispositive—and fatal to Google's construction—but even if it is not, the specification describes multiple other embodiments that also contradict Google's construction. ***For example***, a device's performance can be increased without any other changes to any other devices. *See* '494 Pat., 8:25–29. ***As another example***, when the system is at a power limit (flow 1025), when the GPU core is fully occupied (flow 1035) and the communication bus workload is below its capacity threshold (flow 1040), the algorithm caps both bus and CPU frequency (flow 1050), the specification explains that freed power "may be saved to increase energy efficiency or to be utilized during later timeframes when power is increased above a limit." '494 Pat., 19:41–43; *see also id.*, 18:35–19:46 & Fig. 10. No component's power is concurrently increased. Instead, the savings are banked. ***In another example***, the specification describes an embodiment where a bus is held constant at its floor operating level, and does not decrease, while the GPU core power/frequency may be increased. *See id.*, 18:22–31; *see also id.*, 18:7–34 & Fig. 9.

- 21 -

Google also asserts that because the "specification uses . . . 'balancing' and 'allocation' interchangeably," their meanings are the same. Def.'s Br. at 22–23. Google is incorrect. The specification uses "balancing" to describe the decision-making framework for evaluating workloads and adjusting power distribution among components. *See e.g.*, '494 Pat., 11:5–6 ("balancing policies"), 11:10–11 ("determines an appropriate balancing action"), 11:24 ("balancing decision maker"), 12:7 ("makes the balancing decision"), 18:3 ("balancing algorithm"). In contrast, "allocation" relates to the resulting distribution of power resources. *See, e.g.*, *id*., 7:54–55 ("allocated more current/frequency"), 8:28–29 ("allocated more performance"), 15:30 ("power may be allocated to a core or other interconnect"), 17:36 ("allocated even more power").

Simply put, the specification repudiates Google's proposed construction.

> 3.    The remaining intrinsic evidence does not demand Google's construction.

Neither the patent's owner's statements in inter partes review ("IPR"), nor its statements during prosecution, rise to the level of prosecution disclaimer. A disclaimer occurs "only if the allegedly disclaiming statements constitute a clear and unmistakable surrender of subject matter." *Ecolab*, 569 F.3d at 1342 (internal quotation and citation omitted). That is, the statements "must be so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Genuine Enabling Tech.*, 29 F.4th at 1374 (quotation and citation omitted).

No such "clear and unmistakable" surrender of claim scope occurred here. Google selectively quotes from IPR statements in the patent owner's preliminary response in IPR2023-00617 prior to institution. Def.'s Br. at 20. Google omits that the paragraph of the quoted section begins with "For example" and further omits critical language distinguishing this example from "prior power management approaches which would cap or cut power supplied to high-activity processor elements (because those are the elements consuming high power)." *Id.*, Ex. J (Dkt. 65-11) at 2–3.

Taken as a whole, the "broad and vague statements" identified in Google's Exhibit J (Dkt. 65-11) do not rise to the level of disclaimer. *Maquet Cardiovascular LLC v. Abiomed Inc.*, 131 F.4th 1330, 1343 (Fed. Cir. 2025) (finding no disclaimer in IPR). Even if the patent owner's statements had been somehow on point, they still would not have created a prosecution disclaimer. Federal Circuit precedent holds only that a patent owner's IPR statements "can be relied on" to find disclaimer, not that they must. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017). In *Aylus*, the patent owner's statements resulted in denial of institution of the IPR. *See id.* at 1358. In contrast, as Google's own evidence shows (Def.'s Br., Ex. L (Dkt. 65-13) (granting institution of IPR)), the PTAB "neither (a) adopted that construction in [its] institution decision, (b) issued a final written decision adopting that construction, or (c) determined that the . . . patent's claims are patentable . . ." as a result of the patent owner's statements. *Nikon Corp. v. Optimum Imaging Techs., LLC*, IPR2024-01372, 2025 WL 1180222, at *15 (P.T.A.B. Apr. 23, 2025). Because the patent owner's statements had no impact on the institution decision in IPR2023-00617 and did not affect the rest of that case (which settled), they cannot result in a prosecution disclaimer. *See id.*[5]

Google also relies on the PTAB's statements in the institution decision in IPR2023-00617 (Def.'s Br., Ex. L (Dkt. 65-13) at 3–4), and the PTAB's statements in a final written decision (Def.'s Br., Ex. K (Dkt. 65-12) at 3–4) and an institution decision (*id.*, Ex. M (Dkt. 65-14) at 3–4) in another, different IPR. But these statements are even more broad and vague, referring generally to what the patent "describes" without any connection to specific claim language. Google also fails

---

[5] The PTAB's decision in *Nikon* aligns with the elements of judicial estoppel, which require a prior tribunal to **accept**, *i.e.*, be **successfully persuaded by**, a party's previous stance before an estoppel can apply to a future proceeding. *See Haggart v. Woodley*, 809 F.3d 1336, 1345 (Fed. Cir. 2016) (identifying elements of judicial estoppel); *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (same). "Judicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts." *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).

to identify any case holding that PTAB decisions—as opposed to the patent owner's statements—can result in prosecution disclaimer. Google cites *Bandspeed LLC v. Realtek Semiconductor Corp.*, No. 1:20-CV-765-DAE, 2023 WL 11915723 (W.D. Tex. Aug. 11, 2023), but that case concerned a PTAB decision that directly "addressed the construction of this term." *Id.* at *4. Generic narratives in PTAB decisions that recount something "describe[d]" in a patent do not constitute claim constructions. They are at most background descriptions that cannot result in disclaimer.

Finally, Google relies on an examiner's statement in a provisional nonstatutory double-patenting rejection. *See* Def.'s Br. at 22; *id.*, Ex. N (Dkt. 65-15), at PUB_GOOGLE00001456–57. Google cites *Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380 (Fed. Cir. 2002), and *Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999), for the proposition that failure to dispute an examiner's characterization constitutes acquiescence. But *Inverness* itself held that ambiguous prosecution history cannot create estoppel. *See* 309 F.3d at 1382. And *Elkay* involved an explicit Statement of Reasons for Allowance that the applicant failed to dispute. *See* 192 F.3d at 979. In the double-patenting rejection at issue here, the examiner's broad, vague statement in a passing characterization did not evidence a clear and unmistakable surrender of any subject matter. *See* Dkt. 65-15 at PUB_GOOGLE00001456–57. And the applicant examiner's statement was disputed: in response, the applicant filed a terminal disclaimer. *See* Ex. D (01/03/14 Terminal Disclaimer & Remarks/Arguments) at PUB_GOOG-LE00001478. The Patent Office accepted the terminal disclaimer, which obviated the double-patenting rejection as a matter of law. *See* Ex. E (01/29/14 Terminal Disclaimer Decision).

Accordingly, the history of the prosecution and the subsequent *inter partes* review of the '494 patent does not result in prosecution disclaimer. Google's attempt to rewrite the claim language should be rejected. The claim terms should be given their plain and ordinary meaning.

- 24 -

E.  **U.S. Patent No. 8,775,833 (the "'833 Patent"), Claims 15-18, U.S. Patent No. 10,372,197 ("the '197 Patent"), claims 2-3, 5-7, 9-10, 15-16, 18-20, "is to"**

| Claim Term | Patent/Claims | Plaintiff Daedalus | Defendant Google |
|---|---|---|---|
| "is to" | '833 Patent, claims 15–18 | Not indefinite | The term is indefinite |
|  | '197 Patent, claims 2–3, 5–7, 9–10, 15–16, 18–20 |  |  |

Google argues that the phrase "is to" in certain claims of the '833 and '197 Patents[6] is indefinite under pre-AIA 35 U.S.C. § 112 ¶2. However, Google cannot meet its burden of proving indefiniteness by clear and convincing evidence. *See Sonix*, 844 F.3d at 1377.

1.  *IPXL* does not apply: the claims do not require human user actions.

Specifically, Google argues that "is to" impermissibly mixes apparatus and method claiming under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). Def.'s Br. at 24–27. But every case Google cites for its indefiniteness argument involves claims that explicitly required human user actions.

For example, in *IPXL*, the claim recited "the user uses the input means," and the Federal Circuit held the claim indefinite because it was "unclear whether infringement . . . occurs when one creates a system that allows the user to" perform the action, or when "the user actually uses the input means . . . ." 430 F.3d at 1384. The "is to" claims here contain no such user action requirement. They describe what processor components do, not what users do.

Similarly, with *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011), the claims recited that "certain of said individual callers digitally enter data." *Id.* at 1318. The court held these were "directed to user actions, not system capabilities." *Id.* Again,

---

[6] *See, e.g.*, '833 Pat., cl. 15 ("The system of claim 14, wherein the power sharing logic is to dynamically allocate substantially all of the variable power budget to the first domain for a first workload, and to dynamically allocate substantially all of the variable power budget to the second domain for a second workload executed after the first workload.") (Dkt. 1-1; *also* Dkt. 65-2).

the "is to" claims of the '833 and '197 Patents describe the capabilities of system components like the "power controller" and "power sharing logic," not actions performed by human callers or users. Google also relies on *Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015), a district court case involving a coffee brewing machine whose claims recited physical acts of insertion and heating, such as "the brew baskets being inserted into the location in the beverage brewing machine" and "the brewing machine heating water from the water reservoir." *Id.* at *4–5. These are physical, user-performed actions: someone inserts baskets; the machine heats water during a brewing operation. The claims at issue here involve nothing of the sort. "[T]he first logic is to determine a portion of the power budget to allocate to the first domain based on the first sharing policy value" ('833 Pat., cl. 2) describes an automated processor operation, without any human intervention required. *Lecat's Ventriloscope v. MT Tool & Manufacturing*, 351 F. Supp. 3d 1100 (N.D. Ill. 2018), likewise involved claims reciting both an apparatus and the physical method steps of using that apparatus. *Id.* at 1113. And *H-W Technology, L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014), involved a "tangible computer readable medium" claim that recited method steps like "wherein said user completes" and "wherein said user selects." *Id.* at 1335–36. In each case, the fatal defect was the inclusion of method steps requiring action by a user or external actor—something entirely missing from the "is to" claims.

      2.    <u>The claims at issue recite a structural component having the capability to perform a stated function.</u>

In contrast, the claims at issue here, which all have the form "wherein the [component] is to [function] . . . ," indicate that the identified component has the ***capability*** to perform the stated function. Federal Circuit precedent squarely and repeatedly rejects *IPXL*-type indefiniteness arguments when applied to functional language describing a structure's capabilities.

- 26 -

While no Federal Circuit case has specifically addressed the phrase "is to" in isolation, the Federal Circuit has treated apparatus claims for a device comprising a component with "to" language as describing what the apparatus's component is capable of and is designed to accomplish. In *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354 (Fed. Cir. 2018), the Federal Circuit addressed apparatus claims using "to" constructions—specifically, "'a switch module *to receive*' an oscillating signal . . . , wherein the oscillating signal '*causes* said switch module *to gate* . . . and thereby *generate* a periodic signal . . .'"—and held that such claims describe the component's capability and purpose rather than mandating a particular physical configuration. *See id.* at 1361–62 (quoting patent-in-suit) (emphases in original). The court observed that apparatus claims "cover what a device is, not what a device does," and that the "to" language functions as a capability description of the component. *See id*. (emphases omitted). Similarly, claims of the '833 and '197 Patents that recite, for example, "the power sharing logic is to dynamically allocate substantially all of the variable power budget" ('833 Pat., cl. 15) are directed to the ***capability*** of the power sharing logic component to dynamically allocate substantially all of the variable power budget.

In *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008) (hereafter "*MEC*"), the patent claimed a pipelined processor with functional limitations including "performing a boolean algebraic evaluation," "producing an enable-write," and "determining." *Id.* at 1371–72. The district court found the claim indefinite for mixing apparatus and method recitations. *Id.* at 1374. The Federal Circuit reversed, holding that the claim "is clearly limited to a pipelined processor possessing the recited structure and capable of performing the recited functions, and is thus not indefinite under *IPXL Holdings*." *Id.* at 1375. Thus, despite processor claims with active-verb functional language, the Federal Circuit held in *MEC* that such language describes the structure's functional ***capability***.

In *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816 (Fed. Cir. 2016), the claim recited "an image sensor, said image sensor generating data," and the district court found this indefinite as a hybrid claim. *See id.* at 826. The Federal Circuit reversed again, holding that "the 'data generating' limitations only indicate that the associated structures have this capability . . . and do not require that any data be actually generated by the user." *Id.* at 827. Google attempts to distinguish *UltimatePointer* in its brief (Def.'s Br. at 26), but the court's analysis unmistakably shows that functional language tied to structural elements describes ***capability***, not impermissible method steps. "Unlike the claims in *IPXL* and *Katz*, the claims do not recite functionality divorced from the cited structure." *Id.* at 827–28. In the '833 and '197 Patents, the functionality identified by "is to" is also directly connected to specific structure and recites that structure's capability.

Most recently, in *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017), the claim recited a "reporting module" that "presents," "receives," and "generates"—bare active verbs with no qualifying phrase such as "configured to" or "adapted to." *Id.* at 1315. The district court found the claims indefinite. *See id.* at 1312. The Federal Circuit reversed once again, holding that "though claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe ***capabilities*** of the 'reporting module.'" *Id.* at 1315 (emphasis added). Thus "the claims at issue here merely claim that the system 'possess[es] the recited structure [which is] capable of performing the recited functions.'" *Id.* at 1316 (quoting *MEC*, 520 F.3d at 1375).

The phrase "is to" in the '833 and '197 Patents operates identically to each of these upheld formulations. When a claim recites that "the power controller is to access a power-performance tuning table," '197 Pat., cl. 2, it describes the power controller's ***capability***—precisely as "presents," "receives," and "generates" describe the capabilities of the reporting module in

- 28 -

*MasterMine*. Indeed, "is to [verb]" is more transparent about capability than the bare active verbs in *MasterMine*, because, as in *ParkerVision*, it explicitly includes the infinitive marker "to" that unambiguously identifies the stated function as an intended capability of the recited structure.

    3.  Google's attempts to distinguish the capability case law are unavailing.

   Google argues that "is to" is a "present-tense formulation—mandating that the claimed logic or controller 'is to' perform the recited actions—reads as an operational requirement, leading to claims that cover both a 'system' . . . and its use." Def.'s Br. at 26. But this argument proves too much. If any present-tense functional language in an apparatus claim created indefiniteness, then *MasterMine*'s "presents," "receives," and "generates" would also be indefinite, yet the Federal Circuit held otherwise. *See* 874 F.3d at 1315–16. Google's argument also overlooks that "is to" uses the infinitive form ("is to access," "is to allocate"), which in English grammar expresses existing purpose or capability. The Oxford English Dictionary addresses this directly. Under "be," the construction "be" + infinitive expresses an existing "appointed or arranged future action; (hence also) expressing necessity, obligation, duty, fitness, or appropriateness." Ex. F (OED, "be") § IV.18 at PUB_DPG00005105. Thus "is to access" means "is arranged to access" or "is designed to access." This is the ordinary English meaning of "is to" followed by an infinitive, and a person of ordinary skill in the art—who speaks English—would understand it accordingly.

   Google also attempts to contrast "is to" with "configured to" and "adapted to." Def.'s Br. at 26. Google relies on *UltimatePointer*, but as noted above, that case actually supports Daedalus's argument. There, the Federal Circuit held that "data generating" limitations tied to an image sensor described the sensor's capability, not an impermissible method step requiring user action. *See* 816 F.3d at 826–28. The same is true here: in the '833 and '197 Patents, the functionality identified by "is to" directly follows specific structure and recites that structure's capability. *See id.* at 827–28 ("Unlike the claims in *IPXL* and *Katz*, the claims do not recite functionality divorced from the

- 29 -

cited structure."). Google also cites *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012), for the proposition that "configured to" and "adapted to" denote structural capability, and Google then suggests that "is to" is somehow defective. Def.'s Br. at 26. But the Federal Circuit has never drawn that particular distinction. If "configured to" and "adapted to" denote existing structural capability, then so does "is to." And the *MasterMine* court upheld bare active verbs ("presents," "receives," "generates") without any linking phrase at all; no "configured to," no "adapted to," not even "is to." *See* 874 F.3d at 1315. If bare active verbs satisfy definiteness, the more explicit "is to [verb]" formulation necessarily does as well.

This Court should reject Google's indefiniteness challenge.

## IV.    CONCLUSION

For the foregoing reasons, plaintiff Daedalus's constructions should be adopted.

April 22, 2026                                    Respectfully submitted,

                                                  */s/ Richard Koehl*

                                                  Garland Stephens
                                                    LEAD ATTORNEY
                                                    Texas Bar No. 24053910
                                                    garland@bluepeak.law
                                                  Justin Constant
                                                    Texas Bar No. 24067551
                                                    justin@bluepeak.law
                                                  Richard Koehl
                                                    Texas Bar No. 24115754
                                                    richard@bluepeak.law
                                                  John Brinkmann
                                                    Texas Bar No. 24068091
                                                    john@bluepeak.law
                                                  **BLUE PEAK LAW GROUP LLP**
                                                  3139 West Holcombe Blvd, PMB 8160
                                                  Houston, TX  77025
                                                  Telephone: 281-972-3036

Robert Magee
  California Bar No. 271443 (*pro hac vice*)
  robert@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
3790 El Camino Real, PMB 846
Palo Alto, CA  94306-3314
Telephone: 281-972-3036

Heng Gong
 New York Bar No. 4930509
 heng@bluepeak.law
**BLUE PEAK LAW GROUP LLP**
PO Box 20006
New York, NY 10025-1510
Telephone: 281-972-3036

*Of Counsel:*
Mark D. Siegmund
State Bar No. 24117055
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas   76710
Telephone: (254) 732-2242
Facsimile:  (866) 627-3509
msiegmund@cjsjlaw.com

William D. Ellerman
Texas Bar No. 24007151
**CHERRY JOHNSON SIEGMUND JAMES PLLC**
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
Email: wellerman@cjsjlaw.com

*Attorneys for Plaintiff Daedalus Prime LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Richard Koehl*