**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| DAEDALUS PRIME LLC, | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 7:25-cv-00313-DC-DTG |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**<u>GOOGLE LLC'S REPLY CLAIM CONSTRUCTION BRIEF</u>**

6194196

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT ................................................................................................................1

      A.   Specific Constructions ......................................................................................1

           1.   "interface unit" ('167 patent, claim 21) ...........................................1

           2.   "Energy performance bias (EPB) value" ('197 patent, claims 1-6,
                8-16, 18) .............................................................................................2

                a.   Plain and ordinary meaning is inappropriate. ...................2

                b.   Google's construction is consistent with the specification. .............3

                c.   The prosecution history supports Google's construction.................5

                d.   Extrinsic evidence is consistent with Google's construction...........6

           3.   "Workload configuration input/value" ('197 patent, claims 1-2, 15)..........6

           4.   "dynamically tune power allocation/dynamically balancing power"
                ('494 patent, claims 1-2, 8-9, 12, 16)...............................................7

                a.   Only Google's construction is consistent with the
                     prosecution history and Daedalus's own statements. ......................7

                b.   Only Google's construction is consistent with the
                     examiner's understanding of "dynamically tune power
                     allocation."...............................................................................9

                c.   Only Google's construction is consistent with the
                     embodiments. .............................................................................9

                d.   Daedalus's remaining arguments are unpersuasive. ......................11

      B.   Indefiniteness .................................................................................................12

           1.   "is to" ('833 patent, claims 15-18; and '197 patent, claims 2-3, 5-7,
                9-10, 25-26, 18-20) ...........................................................................12

III.  CONCLUSION.............................................................................................................15

i

6194196

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017)......................................................................................8, 10

*Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*,
    No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015) ......................................13, 14

*Eye Therapies, LLC v. Slayback Pharma, LLC*,
    141 F.4th 1264 (Fed. Cir. 2025) ...............................................................................6, 10, 12

*Fenner Invs., Ltd. v. Cellco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015)....................................................................................4

*Indacon, Inc. v. Facebook, Inc.*,
    824 F.3d 1352 (Fed. Cir. 2016)....................................................................................2, 4

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004)....................................................................................2

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*,
    No. 2023-1335, 2025 WL 2659149 (Fed. Cir. Sept. 17, 2025) .............................................2, 7

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006)....................................................................................8

*ParkerVision, Inc. v. Qualcomm Inc.*,
    903 F.3d 1354 (Fed. Cir. 2018)....................................................................................15

*Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*,
    No. 2:19-CV-00225-JRG, 2020 WL 2517581 (E.D. Tex. May 15, 2020) ................................9

*Rembrandt Data Technologies, LP v. AOL, LLC*,
    641 F.3d 1331 (Fed. Cir. 2011)....................................................................................13

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
    824 F.3d 999 (Fed. Cir. 2016).....................................................................................11

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013)....................................................................................8, 9

*Seachange Int'l, Inc. v. C–COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)....................................................................................6

*Shire Dev., LLC v. Watson Pharms., Inc.*,
    787 F.3d 1359 (Fed. Cir. 2015)...........................................................................................5, 8

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)................................................................................................7

## I.    INTRODUCTION

The claims, read in light of the specifications and prosecution histories, confirm that Google's proposed constructions are correct and that the "is to" claims of the '833 and '197 patents are indefinite and therefore invalid.

## II.    ARGUMENT

### A.    Specific Constructions

#### 1.    "interface unit" ('167 patent, claim 21)

This dispute reduces to whether the claimed "interface unit" must be part of the multicore processor or can be located anywhere, including off-chip. The intrinsic record answers that question: it is part of the processor. Claim 21 recites "the multicore processor of claim 20" where the first and second "plurality of cores" are coupled to an "interface unit." That language describes the architecture of a processor. The claims as a whole are also directed to processor architecture, with both independent claims reciting "a multicore processor comprising" certain elements. And every reference to "interface unit" in the specification describes a component that is "include[d]" in the claimed processor. *See* Ex. D,[1] '167 patent, 2:57–58 ("each core unit may include multiple cores, a cache memory, an interface unit and so forth"); 11:43-46 ("each core unit 510 includes an interface 515 such as a bus interface unit to enable interconnection to additional circuitry of the processor").

Daedalus responds that "coupled to" does not require direct coupling. That is true but irrelevant. Google does not contend that the cores must be "directly" connected to the interface unit. Google contends that the interface unit, like all the other structures recited in the claim, is included in the claimed processor. Daedalus also attempts to blur "interface unit" with

---

[1] Exs. A - O reference exhibits filed with Google's Opening Brief (Dkt. 65-1).

"interface" and "interconnect"—terms that the patent uses distinctly. The specification mentions, e.g., an "interface to enable communication with . . . offchip devices" and an "interface" between a chipset and a graphics engine. *Id.* at 12:34-35, 14:30-33. But the "interface unit" is always specific circuitry included in the processor "to enable interconnection to additional circuitry of the processor." *Id.* at 11:44-46. The claims and specification uniformly describe it that way, and that natural reading also aligns with the patent's focus on a multicore processor with internal circuitry to coordinate communication among cores and other internal components. Nothing in the intrinsic record suggests otherwise. The Court should find that the claimed "interface unit" is circuitry of a multicore processor that interconnects the cores to other circuitry.

2.    **"Energy performance bias (EPB) value" ('197 patent, claims 1-6, 8-16, 18)**
    a.    **Plain and ordinary meaning is inappropriate.**

Daedalus does not dispute that "EPB Value", as shown by the patent and extrinsic evidence, is a coined term with no accepted meaning to a person of skill in the art. Yet Daedalus's "plain meaning" constructions do not construe the term—they merely rearrange its words and improperly seek to expand it beyond what the patent teaches. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]bsent such an accepted meaning, we construe a claim term only as broadly as provided for by the patent itself."); *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (emphasizing that coined terms "ordinarily cannot be construed broader than the disclosure in the specification"). Instead, the Court must look to the specification to understand the meaning of the term in the context of the patent. *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings Inc.*, No. 2023-1335, 2025 WL 2659149, at *6 (Fed. Cir. Sept. 17, 2025) (for coined terms, "we only consider 'the question of what plain and ordinary meaning a term has *in the context of a patent.*'").

2

The specification consistently describes EPB Value as a single, high-level input that expresses a user's preference for power versus performance. For example, it describes the EPB Value as a "single input . . . provided by the user to control these different [power management] features" and a "simple high level input from an end user." Ex. C, '197 patent, 2:50-51; 2:35-38; *see also id.*, 2:51-53; 3:3-6; 3:49-51; 4:58-64. It is not just any value that "influenc[es] a tradeoff." Dkt. 65 at 8. It is a unifying control mechanism: a "single input" that the system translates—via tables and mappings—into multiple low-level power-management settings. Daedalus ignores these teachings. Under its proposal, which has no grounding in the language of the specification, virtually any parameter affecting power or performance would qualify, because all such values ***influence*** the power/performance tradeoff. But the patent teaches a specific abstraction layer that simplifies user control. The term should not be construed more broadly than supported by those disclosures, and in any event, the intrinsic evidence consistently and repeatedly gives the term a single meaning.

    **b.**   **<u>Google's construction is consistent with the specification.</u>**

Google's construction captures the specification's teachings: a single knob that allows users[2] to express their preferences for power/performance tradeoff. It also avoids the boundless scope of Daedalus's construction. Daedalus's counterarguments all fail. First, Google does not argue that the EPB Value must "originate from a human user." Instead, the EPB Value must ***indicate*** a user's preferences for power/performance optimization. Accordingly, Google does not dispute that other external entities like an operating system (OS) or BIOS may convey the EPB Value, so long as those entities are expressing the user's preference.

---

[2] The specification broadly defines "end user" or "user" as including "computer users of varying degrees, including technical and non-technical users, information technology (IT) personnel, data center personnel and so forth." Ex. C, 2:44-47.

Daedalus's citation to a potential lack of "individual control" in the specification only confirms Google's construction. *See* Dkt. 69 at 10 (citing Ex. C, 2:61-63). Daedalus's cited paragraph explains that "instead of providing complete tuning flexibility for each power management technology and allowing an end user to tune each feature, ***a single input [EPB Value] can be provided*** by the user to control these different features." *Id.* at 2:48-51. Thus, even if the user cannot exercise "individual control" over discrete features, he can express his power/performance preference via "a single input" that will control those features. The very next sentence after the "individual control" statement confirms this: "As such, the inherent difficulty in exposing all of a large number of power management features to the end user can be avoided . . ." *Id.*, 2:63-65. The EPB Value is designed to express a user's preference for power/performance tradeoffs without requiring tuning many individual power management features.

Nor does the doctrine of claim differentiation support Daedalus. That doctrine does not even apply when comparing independent claims 1, 11, and 15, which all have different scopes.[3] *See Indacon*, 824 F.3d at 1358 (declining to "apply the doctrine of claim differentiation where, as here, the claims are not otherwise identical in scope"). Moreover, claim differentiation cannot be used to expand the definition of a coined term beyond the intrinsic evidence. *Id.* at 1357; *see also Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015) ("claim differentiation . . . cannot enlarge the meaning of a claim beyond that which is supported by the patent documents, or relieve any claim of limitations imposed by the prosecution history."). The

---

[3] Claim 1 claims a processor; Claim 11, a non-transitory machine-readable medium that causes a machine to perform a method; and claim 15, a system. Each independent claim also has distinct requirements that do not exist in the other claims.

4

specification consistently describes the EPB Value as "a simple high level input from an end user to indicate a power/performance tradeoff preference from the end user." Ex. C, '197 patent, 2:36-38; *see also id.*, 2:50-51, 2:51-53; 3:3-6; 3:49-51; 4:58-64. And the applicant confirmed this during prosecution, stating that "the Specification describes that an EPB value allows an end user to control power/performance tradeoffs in a simple manner." *See* Dkt. 65 at 13.

Finally, Daedalus tries to distinguish power and performance ***optimization*** from power ***savings***. Because there appears to be no practical difference between the terms,[4] to streamline the issues, Google will revise its construction to include Daedalus's preferred language: "A value indicating a user's preference for a tradeoff between power optimization and performance optimization." The Court should adopt this construction.

### c.    The prosecution history supports Google's construction.

Daedalus asserts that prosecution history is only relevant if "the allegedly disclaiming statements constitute a clear and unmistakable surrender of subject matter." Dkt. 69 at 11. Not so. Even if representations in the prosecution history "do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015). Here, the applicant argued that the '197 patent was more than an abstract idea because of the end user's ability to control power management features "even where a non-technical user has little or no understanding of an ability to tune such features." Ex. E at 9; Dkt. 65 at 13–14. The applicant's statements must inform the construction of the term because those statements were made to support patentability.

Daedalus cites two nonbinding PTAB opinions for the proposition that statements made

---

[4] Indeed, the patent repeatedly speaks of power savings. *See* Ex. C, 3:46-49; 4:27-31; 5:59-6:10; 8:53-61; claim 14).

by an applicant when countering a § 101 rejection are irrelevant to claim construction. Dkt. 69 at 12. But courts "examine the entire prosecution history" to construe claim terms. *Seachange Int'l, Inc. v. C–COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005); *see also Eye Therapies, LLC v. Slayback Pharma, LLC*, 141 F.4th 1264, 1269 (Fed. Cir. 2025) ("limiting statements" in the prosecution history inform the meaning of claim language). Here, the applicant told the PTO that the claims were patentable because, "of course there are many other ways to update a power management feature setting, none of which are prevented by the claims here." Ex. E at 8. The overbreadth of Daedalus's proposed construction would undo that pledge.

> **d.    Extrinsic evidence is consistent with Google's construction.**

The extrinsic evidence is also consistent with Google's construction for the same reasons as discussed in § 2.b: the construction does not require an EPB Value to come directly from a user, and software that conveys an EPB Value nevertheless expresses a user's preference. Daedalus also ignores the inventors' own words in the invention disclosure statement that emphasize user preference. *See* Ex. F, INTEL-000132 at 136; Dkt. 65 at 14–15. Google's construction best articulates the scope of EPB Value as described by the intrinsic evidence.

> **3.    "Workload configuration input/value" ('197 patent, claims 1-2, 15)**

Like EPB Value, "workload configuration input" and "workload configuration value" are coined terms with no commonly accepted meaning. Here the specification informs the meaning of the term. By contrast, Daedalus's purported "ordinary meaning" construction has no basis in the intrinsic evidence and goes far beyond what the specification supports.

The specification ties this term to a specific function: selecting tuning settings—via a table, and in combination with the EPB Value—based on workload configurations. Ex. C, 6:61-7:3. It is not just any workload-related value. It is a structured input used to access a defined dimension of a tuning table. Daedalus ignores these teachings. Its proposal ("an input or value

relating to the configuration of a workload") would sweep in virtually any parameter with some connection to a workload. That unbounded construction is untethered to the specification and defies its teaching that "[t]his input allows for choosing tuning settings [from the tuning table] that favor a specific workload pattern." *Id.* at 7:6-7.[5]

"Ordinary meaning" constructions cannot merely rearrange a term's words and expand the meaning that the specification gives that term. For example, in *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1365 (Fed. Cir. 2016), the plaintiff argued for an "ordinary meaning" construction for "byte sequence feature," rearranging the term's words, because it said the words were "familiar." The Federal Circuit rejected that argument, holding that the specification implicitly defined the term. *Id.* at 1365–66. This Court should likewise reject Daedalus's attempt to expand the definition of "workload configuration input/value" because the plain meaning of the term is evident from the specification. *Lambeth*, 2025 WL 2659149 at *6. The Court should adopt Google's proposed construction.[6]

### 4. "dynamically tune power allocation/dynamically balancing power" ('494 patent, claims 1-2, 8-9, 12, 16)

#### a. Only Google's construction is consistent with the prosecution history and Daedalus's own statements.

Daedalus's own statements, the specification, and the PTAB record all point to the same core concept: improving overall performance within power constraints by allocating more power to one component while reducing power to another component. That is exactly what Google's

---

[5] Daedalus's claim differentiation arguments fail for the same reason as with EPB Value. The scope of the independent claims are different, and claim differentiation cannot be used to expand the meaning of a coined term beyond what the specification teaches. *See supra*, § 2.b.

[6] Daedalus complains that Google lists exemplary workload types from the specification, such as "NUMA," "UMA," and "I/O intensive." But these examples are preceded by the abbreviation "e.g."—meaning "for example." They are non-limiting examples that clarify the term's meaning.

construction captures. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331,1334, 1338 (Fed. Cir. 2006).[7]

Daedalus now tries to retreat from its prior endorsement of that core inventive concept, asserting instead that "the specification provides for dynamic allocation to achieve maximum performance," not "increasing power to one component at the expense of another." Dkt. 69 at 20 (emphasis omitted). But before the PTAB, Daedalus distinguished prior art by arguing that merely adjusting components, "'such that all elements can be run at the highest possible performance within the budget' is not 'dynamically tun[ing] power allocation ***between*** the first core and the communication bus' as claimed." Ex. P[8] at 11. Instead, Daedalus told the PTAB that the claims require "ensur[ing] the device that needs more resources for better overall performance is allocated such extra resources, while other devices are 'balanced' (reduced in performance) to meet a given power limit." *Id.* That is the same meaning Google proposes here.

The disclaimer doctrine exists to prevent exactly this kind of reversal. A patentee cannot characterize their patents "one way in order to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017). Daedalus should be held to its prior characterization of the invention. *Id.* at 1362; *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013). And even if those statements do not rise to disclaimer, they remain intrinsic evidence supporting Google's construction. *Shire Dev., LLC v. Watson Pharms., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015).

Daedalus's current position is also internally inconsistent. In one breath, Daedalus says

---

[7] Given Daedalus's representation that it construes "dynamic" to mean changes specified or performed at run time rather than in advance, Dkt. 69 at 20, the parties do not appear to have a dispute as to that particular term.

[8] Exhibits P - Q are attached to the Decl. of Erin E. Meyer filed concurrently herewith.

the invention is directed to *maximizing* performance; in the next, it argues that the claims can be satisfied even when a system *reduces* performance to improve energy efficiency. Dkt. 69 at 21. That "nose-of-wax" approach should be rejected. *Ramot at Tel Aviv Univ. Ltd. v. Cisco Sys., Inc.*, No. 2:19-CV-00225-JRG, 2020 WL 2517581, at *12 (E.D. Tex. May 15, 2020).

**b. <u>Only Google's construction is consistent with the examiner's understanding of "dynamically tune power allocation."</u>**

The intrinsic record supports not just Google's description of the invention, but Google's construction of the claim language itself. As Google explained in its opening brief, when rejecting the precursor to claim 1, the examiner understood "dynamically tune power allocation" to refer to counterbalancing adjustments in power between components. *See* Dkt. 65 at 21–22.

Daedalus does not dispute that conclusion and instead responds only that its failure to contest the examiner's understanding did not amount to disclaimer. Dkt. 69 at 24. But Daedalus does not meaningfully dispute the predicate point: the examiner in fact understood the claim language the same way Google does. Whether or not that understanding independently establishes disclaimer, it still supports adopting Google's construction. *Saffran*, 712 F.3d at 559 (relying on the fact that the "examiner shared Saffran's stated view of the claimed device").

**c. <u>Only Google's construction is consistent with the embodiments.</u>**

There is no dispute that the specification repeatedly describes embodiments in which power is increased to one component at the expense of another. *See, e.g.*, Ex. B, '494 patent, 10:28-35; 10:60-64; 11:32-37; 14:1-10; 15:28-34; 18:3-6; 18:31-34. Instead, Daedalus points to three embodiments that it says involve adjusting power to a component without a concurrent offset. *See* Dkt. 69 at 21 (citing '494 patent at 8:25-29; 18:7-34 & Fig. 9; 18:35-19:46; Fig. 10).

At the outset, Google's construction does not read out these embodiments, all of which contemplate counterbalancing adjustments in at least some circumstances.[9] *See* '494 patent at 8:43-46; 18:12-14; 19:43-46. Nothing about Google's proposed construction precludes an embodiment that, in addition to dynamically tuning power allocation/balancing power, also implements one-way adjustments periodically.[10] Thus, Google's proposed construction would not exclude the embodiments Daedalus cites unless Daedalus means to argue that those embodiments encompass systems and methods that ***only*** make one-way adjustments and ***never*** offset power allocations. To the extent that is Daedalus's argument, it lacks merit.

First, even if the cited embodiments could be read as involving only one-way adjustments, Daedalus has already disclaimed that reading. In its IPR preliminary response, Daedalus argued that "adjusting the cores and bridge logic downward together is not the same as 'dynamically tun[ing] power allocation ***between*** the first core and the communication bus' as claimed." Ex. P at 30. Daedalus cannot now argue that the claims nevertheless cover such embodiments. *See Aylus Networks, Inc.*, 856 F.3d at 1362.

Second, at least some of the embodiments identified by Daedalus aren't covered by the '494 patent's claims reciting those terms and thus are not excluded by Google's construction. Daedalus argues, for example, that a device's performance can be increased without any change to any other device. That does not fit claim 1, which requires a power reduction. Nor claim 8, which assumes that "the package has reached the thermal or power limit." As the specification

---

[9] The specification clarifies that references to "'one embodiment' or 'an embodiment' means that a particular feature, structure or characteristic described in connection with the embodiment is included in at least one embodiment of the present invention." Ex. B, '494 patent at 20:60-64

[10] Both relevant independent claims are open-ended, using "comprising." *Eye Therapies, LLC v. Slayback Pharma, LLC*, 141 F.4th 1264, 1269 (Fed. Cir. 2025) ("Generally, the term 'comprising' is an open-ended transitional term that allows for additional steps.").

explains, once the platform is "operating at a power or thermal limit," any performance increase must be "counterbalanced by a reduction or cap." Ex. B, '494 patent, Abstract.

Third, Daedalus's reading would collapse the claims into conventional techniques the patent itself distinguishes. The specification explains that when the system is not operating at or above a limit, "***existing methodologies***, such as race to the finish methodologies (i.e. increase power to one or more elements to improve performance) are utilized." '494 patent at 18:65-19:1 (emphasis added). It then contrasts those conventional methodologies with what happens when the system "is at a limit," which causes it to "balanc[e]" "the power/frequency . . . between the elements." *Id*. at 19:1-3. That distinction further supports Google's construction. *See Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016).

### d.      <u>Daedalus's remaining arguments are unpersuasive.</u>

First, Daedalus argues that Claim 1 of the '494 patent doesn't require the system to be operating at a power limit. Dkt. 69 at 18. But Google never argued that it did. The claims do not require that counterbalancing occur only when the system has reached a thermal limit. The specification describes prospective balancing as well. *See, e.g.*, '494 patent at 7:49-61; 11:24-44.

Second, Daedalus argues that Google's construction improperly makes dependent claim 3 broader than independent claim 1 because claim 3 refers to "capping" frequency rather than "decreasing" it. But nothing from the patent indicates that "capping" and "decreasing" have different meanings. To the contrary, the patent repeatedly treats those concepts as equivalent in this context, explaining that capping frequency is a mechanism for ***decreasing*** performance or power consumption to offset an increase elsewhere. *Id.* at 14:2-7; 17:16-19; 17:49-51; 18:25-28.

Third, Daedalus argues that the term "adjusting" does not "suggest any directionality." Dkt. 69 at 19. But, again, Google never argued it did; nor would it, given that Google's construction interprets power adjustments to encompass concurrent increases and decreases.

11

Fourth, Daedalus argues that phrases that incorporate the terms "balancing" and "allocation" cannot have the same construction because those words do not mean the same thing. Dkt. 69 at 22. But Daedalus cannot identify any substantive difference between the two terms. For example, Daedalus purports to describe the ***function*** of "balancing" (describing a framework) but never describes its ***meaning***, and more importantly, how that meaning differs from the term "allocation." Within the context of the specification, and with regard to power management, those terms are equivalent, as Google described. *See* Dkt. 65 at 22-23. Indeed, Daedalus itself has treated the concepts as interchangeable: it described claim 1—which recites "dynamically tune power allocation"—as involving a "dynamic balance" between devices in its PTAB filings. Ex. P at 11.[11] Daedalus's contention that "balancing" and "allocation" have different meanings is also based on a grammatical error—another reason to reject it.[12]

## B.    Indefiniteness

### 1.    "is to" ('833 patent, claims 15-18; and '197 patent, claims 2-3, 5-7, 9-10, 25-26, 18-20)

Several claims in the '833 and '197 patents claim an apparatus but also recite operation of the claimed apparatus using the phrase "is to," such as "the power sharing logic is to dynamically allocate substantially all of the variable power budget to the first domain . . . ." Ex.

---

[11] Daedalus also (briefly) argues that Claim 8 does not contemplate adjusting the graphics processor because the claim later recites specific adjustments to the central processor and communication bus, but not the graphics processor. *Id.* However, the subsequent identification of specific adjustments to the central processor and communication bus does not imply that the graphics processor is excluded from the balancing the claim expressly recites.

[12] In arguing that the "specification uses 'balancing' to describe the decision-making framework," Dkt. 69 at 22 (emphasis added), Daedalus appears to treat "balancing" as a participial adjective, even though it is used as a gerund in the claim language. *See* Ex. Q, WIPO Drafting Manual (2nd Ed.) at 42, ("Activity elements . . . are typically introduced with verbs in gerund form . . ."). Because it is not being used as an adjective, "balancing" is not describing anything. The term identifies an action, consistent with Google's construction.

A, '833 patent, cl. 15. Daedalus attempts to sidestep the rule against hybrid claiming, but its arguments are inconsistent, mischaracterize the law, and ignore the actual claim language.

Daedalus first argues that the rule against hybrid claiming cannot apply here because it is limited to apparatus claims that "require human user actions," while these claims (according to Daedalus) only require "automated processor operation" and "describe what processor components do, not what users do." Dkt. 69 at 25–26. But Daedalus cites no authority circumscribing the rule to claims reciting "human user actions." In fact, *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011), illustrates that Daedalus is wrong. In *Rembrandt*, the claims covered a "data transmitting device" and recited various elements of the apparatus. *Id.* at 1338–39. But one limitation also recited a method step— "transmitting the trellis encoded frames"—which the Federal Circuit held rendered the claims indefinite because it meant they "recit[ed] both an apparatus and a method of using that apparatus." *Id.* at 1339 (quoting *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)). Just like the limitations in the '833 and '197 patents that Daedalus argues are merely "automated processor operation[s]," the "transmitting" limitation in *Rembrandt* was an automated step performed by the claimed "data transmitting device," but nonetheless violated the rule against hybrid claiming. In the same vein, Daedalus incorrectly argues that the claims in *Courtesy Products, L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015), involved only "user-performed actions." Dkt. 69 at 26. In fact, those claims (which covered a coffee brewing machine) recited, among other things, "the brewing machine heating water from the water reservoir." *Courtesy Products,* 2015 WL 7295436, at *4–5. Daedalus acknowledges that the coffee machine itself (not a person) heats water. Dkt. 69 at 26. Thus, just like the claim limitations in the '833 and '197 patents, the step of

13

"heating water" in *Courtesy Products* is an automated step performed by the claimed apparatus and not by a human user, but was still indefinite as creating a hybrid claim. Simply put, Daedalus's attempt to artificially cabin the rule against hybrid claiming lacks merit.

Daedalus next tries to disavow its position that the "is to" limitations in the '833 and '197 patent require operation at all—automated or otherwise—arguing instead that those limitations merely require "capability" to perform the recited action. Dkt. 69 at 26. As Google already pointed out, however, the claims do not recite any of the formulations of capability language— such as "capable of," "configured to," or "adapted to"—that courts have recognized as denoting capability rather than actual performance. Dkt. 65 at 26. Rather, Daedalus tries to shoehorn the claim language in the '833 and '197 patents into cases dealing with functional language that indisputably described capability rather than actual operation, *id.* at 26–29, but its essential premise—that the '833 and '197 patents also use capability language—is wrong. For example, the ordinary meaning of the statement "The committee *is to* review the proposal" is that the committee *will* or *must* review the proposal, not merely that it has the unexercised *capability* to do so. Similarly, stating that "All employees *are to* attend the safety training" ordinarily means that every employee *will* or *must* actually attend the safety training, not merely that the employees have the capacity to attend. Daedalus's own citation to the Oxford English Dictionary reinforces the import of reciting "is to:" as Daedalus itself highlights, "'be' + infinitive expresses an existing '***appointed or arranged future action***.'"[13] Dkt. 69 at 29 (emphasis added).

None of Daedalus's cited cases are on point because none address the idiosyncratic "is

---

[13] The remainder of Daedalus's OED excerpt—that "'be' + infinitive" also "express[es] necessity, obligation, duty, fitness, or appropriateness," Dkt. 69 at 29—merely states the unremarkable proposition that performing some action necessarily implies, as a prerequisite, the capability to perform the action—"fitness" or "appropriateness" in the OED's explication.

to" formulation used in the '833 and '197 patents. *See* Dkt. 69 at 26–29. Indeed, Daedalus concedes there is no Federal Circuit case dealing with this claim language, much less one that endorses Daedalus's position that it merely requires capability rather than performance of the recited action. *Id.* at 27. For example, Daedalus cites *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354 (Fed. Cir. 2018), but omits that *ParkerVision* did not address hybrid claiming. Rather, the issue in *ParkerVision* was "distinguish[ing] between claims with language that recites capability, and those that recite *configuration*." *Id.* at 1361 (emphasis added). Because the apparatus claims in *ParkerVision* required only capability, the Federal Circuit concluded that a device described in a prior art reference invalidated the claims even though it possessed the recited capability only under certain conditions. *Id.* at 1360–62. If anything, *ParkerVision* underscores the concern raised by hybrid claims, because the court reached different conclusions for the apparatus claims and method claims on the ground that, as to the method claims, there was no evidence that "[the prior art] device, even if capable of doing so, actually would [perform the recited function]." *Id.* at 1363. Thus, knowing whether an apparatus claim recites actual operation or not is critical to understanding the scope of the claim with reasonable certainty.[14]

The asserted claims of the '833 and '197 patents that use the phrase "is to" should be found indefinite for violating the rule against hybrid claiming.

III.    **CONCLUSION**

For the foregoing reasons and those in Google's Opening Brief, Google respectfully requests that the Court (1) adopt Google's proposed constructions; and (2) find that the "is to" claims of the '833 and '197 patents are indefinite and therefore invalid.

---

[14] Daedalus's other cited cases—*Microprocessor Enhancement Corp.*, *UltimatePointer*, and *MasterMine Software*—are also inapposite because none involved the same claim language used in the '833 and '197 patents.

Dated: May 6, 2026

Respectfully submitted,

By: */s/ Erin E. Meyer*

David Silbert (*pro hac vice*)
dsilbert@keker.com
Erin E. Meyer (*pro hac vice*)
emeyer@keker.com
Christopher S. Sun (*pro hac vice*)
csun@keker.com
Andrew S. Bruns (*pro hac vice*)
abruns@keker.com
Vishesh Narayen (*pro hac vice*)
vnarayen@keker.com
Ryan J. Hayward (*pro hac vice*)
rhayward@keker.com
Jacqueline Concilla (*pro hac vice*)
jconcilla@keker.com
Niharika Sachdeva (*pro hac vice*)
nsachdeva@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Tel: 415-391-5400

Nathaniel St. Clair, II
nstclair@jw.com
JACKSON WALKER LLP
323 Ross Ave #600
Dallas, TX 75201
(214) 953-6000

Attorneys for Defendant
GOOGLE LLC

16

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on May 6, 2026, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/Paige Welch*
Paige Welch
