**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| DAEDALUS PRIME LLC, | § | |
| | § | |
| | § | Civil Action No. 7:25-cv-00313-DC-DTG |
| Plaintiff, | § | |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| GOOGLE LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**Google LLC's Objections to Claim
Construction Order and Memorandum (Dkt. 80)**

**TABLE OF CONTENTS**

Page

I.   Introduction ........................................................................................................... 1

II.  Objections to Constructions ................................................................................. 1

     A.   "interface unit" ('167 Patent, Claim 21) ................................................... 1

     B.   "energy performance bias (EPB) value" ('197 Patent, Claims 1–6, 8–16, 18) .......................................................................................................... 3

     C.   "workload configuration input" / "workload configuration value" ('197 Patent, Claims 1–2, 15) ........................................................................... 7

     D.   "dynamically tune power allocation" / "dynamically balancing power" ('494 Patent, Claims 1–2, 8–9, 12, 16) .................................................... 8

     E.   "is to" ('833 Patent, Claims 15–18; '197 Patent, Claims 2–3, 5–7, 9–10, 15–16, 18–20) ........................................................................... 10

III. Conclusion ......................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)........................................................................................3

*Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*,
  No. 13-2012-SLR, 2015 WL 7295436 (D. Del. Nov. 18, 2015) .............................................11

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
  822 F.3d 1312 (Fed. Cir. 2016)........................................................................................6

*Intervet Inc. v. Merial Ltd.*,
  617 F.3d 1282 (Fed. Cir. 2010)........................................................................................4

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
  430 F.3d 1377 (Fed. Cir. 2005)......................................................................................10

*KCJ Corp. v. Kinetic Concepts, Inc.*,
  223 F.3d 1351 (Fed. Cir. 2000)........................................................................................3

*Kraft Foods, Inc. v. Int'l Trading Co.*,
  203 F.3d 1362 (Fed. Cir. 2000)........................................................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)................................................................................................10, 11

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006)........................................................................................5

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................................................3

*Rembrandt Data Techs., LP v. AOL, LLC*,
  641 F.3d 1331 (Fed. Cir. 2011)......................................................................................10

*Trs. of Columbia Univ. v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016)........................................................................................6

## I.    Introduction

Defendant Google LLC respectfully submits its objections to the Court's July 20, 2026, Claim Construction Order and Memorandum (Dkt. 80) ("Order") pursuant to Federal Rule of Civil Procedure 72(a). The Order addresses specific terms in U.S. Patent Nos. 8,775,833 (the "'833 patent"), 8,898,494 (the "'494 patent"), 10,372,197 (the "'197 patent"), and 11,507,167 (the "'167 patent"). For the reasons explained below, the Order's constructions lack support in the intrinsic and extrinsic records and are clearly erroneous and contrary to law.

## II.    Objections to Constructions

### A.    "interface unit" ('167 Patent, Claim 21)

| Google LLC's Proposed Construction | Order |
| --- | --- |
| "Circuitry of a multicore processor that interconnects the cores to other circuitry" | Plain and ordinary meaning |

Google objects to the Order's construction of "interface unit" in claim 21 of the '167 patent. Daedalus's "plain and ordinary meaning" construction improperly broadens the term beyond what is supported by the intrinsic record and what would have been understood by a POSITA. In turn, the Order erred in declining to adopt Google's proposed construction, which is consistent with the specification and claim language.

Claim 21 is dependent on independent claim 14, whose preamble recites "a multicore processor comprising" the first and second pluralities of cores. ('167 patent, cl. 14). The first and second pluralities of cores are therefore elements of the claimed multicore processor. Claim 21 then recites that "the first plurality of cores and second plurality of cores are further coupled to an interface unit." ('167 patent, cl. 21). The past participle "coupled," like claim 20's "further coupled to a plurality of units of a last level cache," describes an existing structural configuration of the multicore processor introduced in the preamble, not a relationship to some external component. That is, given that claim 21 is directed to the multicore processor of independent

1

claim 14 and further defines features of the multicore processor, the natural reading of claim 21 is that the interface unit is a structural component of the multicore processor that couples the plurality of cores of the multicore processor.

The specification confirms this understanding by consistently describing the interface unit that couples the plurality of microprocessor cores as itself part of the multicore processor. For example, Figure 1 depicts a multicore processor 110 that includes multiple core units 120a-120n, where "each core unit may include multiple cores, a cache memory, an interface unit and so forth." ('167 patent, 2:55–58). Figure 7 similarly shows a processor 500 that includes a plurality of core units 5100-510, where "each core unit 510 includes an interface 515 such as a bus interface unit to enable interconnection to additional circuitry of the processor." ('167 patent, 11:38–46.)

While the Order cites other "interface-related terminology" that purportedly cuts against "a rigid co-location requirement," the examples cited actually demonstrate that interfaces in the '167 patent are circuitry located on the processor. The specification introduces "input/output interface 132" and "another interface 134" (PCIe) as "additional components . . . present within the processor," describes "an interface between PCU 200 and other components of a processor," and situates the PCU's "dedicated interface" to the external voltage regulator on the processor itself. ('167 patent, 3:1–14, 5:21–27, 3:22–24.) Similarly, interconnect 615, interfaces 650, and interfaces 780 are likewise components of the processor's on-die interconnect, system agent, or uncore. ('167 patent, 12:47–52, 13:55–59.) Even the interfaces that reach off-chip (*e.g.*, interfaces 580, 650, and 780) are themselves on-processor circuitry that enable "interconnection between the processor and other circuitry" and communication with "offchip devices." ('167 patent, 12:66–13:1, 13:57–59.) Thus, the language relied on by the Court does not cut against

2

Google's construction of "interface unit," which is specifically described as included in the multicore processor. Rather, that language confirms Google's construction is consistent with the specification's descriptions of interfaces generally.

Finally, the Court's singular "interface unit" rationale presents a legal error. In discussing Figure 7, the Order recognizes Figure 7 depicts separate core units that each include an interface 515 such as a bus interface unit. (Dkt. 80 at 6.) The Order suggests claim 21 recites "a singular 'interface unit' coupled to the first plurality of cores and the second plurality of cores," and therefore concludes Figure 7 makes a poor basis for limiting claim 21. This reasoning is erroneous for two reasons. First, the interpretation of "an interface unit" as recited in claim 21 does not necessarily mean one-and-only-one. The indefinite article "an" in an open-ended "comprising" claim means "one or more," absent a clear intent to limit it to the singular. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Second, Google's intent is not to limit claim 21 to the embodiment shown in Figure 7. Instead, based on the specification as a whole as described above, Google's construction "most naturally aligns with the patent's description of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). Leaving the term unconstrued permits Daedalus to read "interface unit" to encompass "any off-chip or external communication device," untethering the claim from the architecture the patent describes.

**B.**      **"energy performance bias (EPB) value" ('197 Patent, Claims 1–6, 8–16, 18)**

| Google LLC's Proposed Construction | Order |
|---|---|
| "A value indicating a user's preference for a tradeoff between power optimization and performance optimization" | Plain and ordinary meaning, which means a value indicating a tradeoff between power optimization and performance optimization and not limited to a user's preference |

Google objects to the Order's construction of "energy performance bias (EPB) value," recited in claims 1–6, 8–16, and 18 of the '197 patent to the extent it differs from Google's proposed construction. While the Order correctly agreed that EPB value *indicates* rather than *influences* a tradeoff between power optimization and performance optimization, it erred by failing to expressly require that the EPB value indicates "a user's preference" for the tradeoff. Specifically, the Court's construction does not comport with how the '197 patent describes its processor for "user level control of power management policies." (*See* '197 patent, Title.)

The background of the '197 patent sets forth the specific problems solved by the claimed invention: (i) typical power management strategies fail to account for end users willing to tolerate more performance loss in return for power savings, (ii) end users typically have no choice regarding power/performance tradeoffs, and (iii) end users rarely tune individual features for their target usage given the complexity of tuning power management features. ('197 patent, 1:59–2:5.) Thus, the specification describes an EPB value that "indicate[s] a power/performance tradeoff preference from the end user." ('197 patent, 2:34–38.) Indeed, the Order acknowledges that the specification "describes EPB as a user-facing abstraction" but declined to give that description weight because it did not find "lexicography or disavowal." (Dkt. 80 at 9.)

"EPB value," however, is a coined term. ('197 patent, 2:34–35 ("Embodiments provide a *so-called* energy performance bias (EPB) as an architectural feature.") (emphasis added).) "Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification." *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1315). Thus, *Phillips* compels Google's construction independent of lexicography or disavowal. And in any event, lexicography or disavowal need not be explicit. They can be implied when the patentee makes clear statements

4

characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope.").

Here, the background of the '197 patent consistently describes the EPB value as indicating a user's preference between power optimization and performance optimization. (*See, e.g.*, '197 patent, 2:34–43 (describing an EPB value that indicates an end user's preference for power/performance tradeoff and how such value is provided), 3:46–49 (describing how an end user may use the EPB value to choose between performance-oriented tuning settings and power saving-oriented tuning settings)).

The Order further errs in its reliance on two sentences describing that the provision of the EPB value can be from external entities (e.g., an OS, BIOS, BMC) "automatically or via a user" and that "the end user may be prevented from such individual control." (Dkt. 80 (citing '197 patent, 2:53–61).) First, the context of these two sentences clarifies that the end user may be prevented from control of individual features—not from control of the EPB value. The passage from which these sentences originate explains that "instead of providing complete tuning flexibility for each power management technology and allowing an end user to tune each feature, a single input can be provided by the user to control these different features." ('197 patent, 2:48–51.) Thus, when the specification states "the end user may be prevented from such individual control," it refers to control of "each feature," not of the EPB value. ('197 patent, 2:61–63.) Indeed, the specification immediately follows with: "the inherent difficulty in exposing all of a large number of power management features to the end user can be avoided, particularly as most

5

end users have little or no knowledge as to how to tune such individual features." ('197 patent, 2:63–67.)

Second, the Order's focus on the source of the EPB value misapprehends Google's position. Google's construction does not require that the EPB value must *originate* from a human user. Rather, the EPB need only *indicate* a user's preference for power/performance optimization. Therefore, while the EPB value may be provided by "external entities" either automatically or via a user, that source of the EPB value does not change what the EPB *conveys*: a user's preference for a tradeoff between power optimization and performance optimization.

This relationship between the source of the EPB value and what it conveys is demonstrated by claims 11 and 13. Independent claim 11 requires that "the EPB value . . . *indicate* a preference of a user for a tradeoff between power optimization and performance optimization," while dependent claim 13 specifies *how* the EPB value is set (*i.e.*, by a user, an operating system, or a baseboard management controller). ('197 patent, cls. 11, 13.) Nothing in the language of claims 11 and 13, or the specification, requires that the method by which the EPB value is set dictates what the EPB value conveys. Put another way, an EPB value set by a non-user still reflects or indicates a user preference. The two are not mutually exclusive.

Finally, the Order's claim-differentiation rationale improperly broadens "EPB value" beyond the intrinsic record. Claim differentiation, however, is only a rebuttable presumption, overcome where the written description or prosecution history establishes the term's meaning—both of which do so here. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016). Here, the specification describes an EPB value that "indicate[s] a power/performance tradeoff preference from the end user" ('197 patent, 2:34–38), and the applicant confirmed during prosecution that the EPB value allows a user to tune

6

power/performance tradeoffs in a simplified manner. (Dkt. 65-6, '197 Pros. History, Remarks/Arguments dated Nov. 2, 2018, at 9.)

The Order tries to distinguish these teachings by focusing on the EPB value's *origin* rather than what it *conveys*, and by reasoning that the prosecution statements do not "clearly state that every EPB value in every claim must indicate a user preference." (*See* Dkt. 80 at 10–12.) But the level of explicit lexicography and disavowal sought by the Order is not required. Lexicography and disavowal may be implicit too. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) (rejecting the argument that the patentee must expressly or explicitly define a term or disavow the full scope and explaining that meaning may be ascertained by a reading of the patent documents). Here, the intrinsic record confirms Google's construction and overcomes any presumption of claim differentiation. *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1369 (Fed. Cir. 2000) (explaining that choosing "several words in drafting a particular limitation of one claim, but fewer (though similar) words in drafting the corresponding limitation in another, does not mandate different interpretations of the two limitations").

C. **"workload configuration input" / "workload configuration value" ('197 Patent, Claims 1–2, 15)**

| Google LLC's Proposed Construction | Order |
| --- | --- |
| "A value indicating a predominant pattern of execution with particular hardware configuration demands (e.g., NUMA, UMA, I/O intensive)" | Plain and ordinary meaning |

Google objects to the Order's construction of "workload configuration input" / "workload configuration value" as recited in claims 1–2 and 15 of the '197 patent. Daedalus's interpretation of "plain and ordinary meaning" extends beyond what the patent supports, and the Court's "plain and ordinary meaning" construction creates rather than resolves ambiguity, leaving latent claim

scope disputes for the jury. The Court acknowledged that Google "identifies a legitimate distinction between a workload-configuration input and generic power-management preference" and further recognized that the intrinsic evidence supports Google's construction. (Dkt. 80 at 14.) Though the Court takes issue with the phrase "particular hardware configuration demands," this phrase captures the specification's description of a workload configuration input. (*See* '197 patent, 6:61–7:14.) And to the extent the Court finds the non-limiting examples problematic, the remedy is a modified construction rather than a plain and ordinary meaning construction that ultimately leaves the claim scope dispute unresolved. Accordingly, the Court should construe the terms to require a value indicating a predominant pattern of execution, consistent with the claims and specification.

**D.    "dynamically tune power allocation" / "dynamically balancing power" ('494 Patent, Claims 1–2, 8–9, 12, 16)**

| Google LLC's Proposed Construction | Order |
|---|---|
| "Adaptively increasing power for one component while concurrently reducing power to another component" | Plain and ordinary meaning, which does not require every increase in power for one component to include reducing power to another component |

Google objects to the Order's construction of "dynamically tune power allocation" / "dynamically balancing power" as recited in claims 1–2, 8–9, 12, and 16 of the '494 patent. The Order erred in declining to adopt Google's proposed construction, which clarifies that "dynamically tune power allocation" / "dynamically balancing power" means "[a]daptively increasing power for one component while concurrently reducing power to another component."

The '494 patent's "Background" section expressly identifies the problem addressed by the claimed invention as the implementation of power saving policy individually and separately, which often does not balance power and performance among asymmetric cores to achieve overall maximum performance. ('494 patent, 1:50–57.) Thus, the claimed invention purports to

solve the problem by striking "a dynamic balance . . . between devices to ensure the device that needs more resources for better overall performance is allocated such extra resources, while other devices are 'balanced' (reduced in performance) to meet a given power limit." ('494 patent, 7:56–61.) The specification consistently describes this mechanism as an *inverse relationship* between two components—power is increased to one component at the expense of another to meet real-time performance demands. (*See, e.g.*, '494 patent, 10:28–35, 10:60–64, 11:32–37, 14:1–10, 15:28–34, 18:3–6, 18:31–34.) While the Court identifies some embodiments in which an increase in performance might not include a counterbalancing reduction in the other device, such embodiments merely clarify that various forms of power allocation, other than dynamic balancing, may be performed. That is, nothing in the specification indicates an embodiment adjusting power without counterbalancing engages in *dynamic* power allocation as opposed to a different form of power allocation.

The prosecution history and post-grant history support this understanding of the claim terms. During prosecution, the Examiner understood the claim as "direct[ed] to a reduction of frequency of components for optimized performance," which "would allow for more resources to allocate to the cores or vice versa." (Ex. N, 10/4/2013 Office Communication at 7.) Daedalus did not dispute this interpretation of the claims and indeed proffered a similar interpretation before the PTAB during IPR. (*See* Ex. J, IPR2023-00617 POPR at 2–3 (stating that the inventors determined that increasing power supplied to high-activity elements would reduce bottlenecking but would require power allocation tuned between components).) In deciding to institute IPR, the PTAB similarly described offsetting increases in power supplied to one component by decreasing the power supplied to another:

> The '494 patent describes alleviating bottlenecks by allocating more
> current or frequency to the bottlenecked component and capping or

9

limiting competing devices. This strikes a dynamic balance between devices so that a device that needs more resources for better overall performance is allocated extra resources, while other devices are reduced in performance to meet a given power limit.

(Ex. K, IPR2023-01343 Final Written Decision at 3–4; Ex. L, IPR2023-00617 Decision Instituting IPR at 3–4; Ex. M, IPR2023-01343 Decision Instituting IPR at 3–4.) In summary, Google's claim construction is most consistent with the specification, the prosecution history, and the proceedings before the PTAB. The Order erred in not giving effect to Daedalus's clear and unmistakable claim scope disclaimer before the PTAB.

### E.    "is to" ('833 Patent, Claims 15–18; '197 Patent, Claims 2–3, 5–7, 9–10, 15–16, 18–20)

| Google LLC's Proposed Construction | Order |
|---|---|
| Indefinite | Not indefinite |

Google objects to the Order's construction of the "is to" clauses recited in claims 15–18 of the '833 patent and claims 2–3, 5–7, 9–10, 15–16, and 18–20 of the '197 patent. The Order erred in declining to find the terms indefinite. As used in the claims, "is to" expresses an operational directive, not a capability, impermissibly mixing apparatus and method claiming. As a result, the claim language "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Specifically, the phrase "is to [perform function]" describes what the claimed structure will do, not merely what it is able to do, and thus recites both a system and its use, thereby creating the infringement-timing uncertainty *IPXL* condemns. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). A manufacturer cannot tell from the face of claim 15 of the '833 patent whether it infringes upon making or selling the accused system, or only when the "power sharing logic" actually allocates the power budget.

10

The Court's reliance on *MasterMine* does not resolve this concern. The verbs approved in *MasterMine* describe what a component inherently does, whereas "is to" adds the infinitive of futurity or obligation, denoting an act that will or must occur, as in "the committee ***is to review*** the proposal." The Court dismissed that distinction as a "magic-words" argument, but Google's objection is not to the absence of "configured to" or "adapted to." Rather, it is that "is to" affirmatively signals required future operation rather than structural capability. The Court's own authority confirms the point: capability language passes muster only when it "reflects the capability of that structure rather than the activities of the user" or the device. (Dkt. 80 at 22–23 (citing *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016)).)

In summary, in this case, the "is to" clauses direct the structure to carry out in the future the very method steps—allocating, incrementing, accessing, and updating—that *IPXL*, *Rembrandt*, and *Courtesy Products* held cannot be combined with apparatus elements in a single claim. *See IPXL*, 430 F.3d at 1384; *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1338–39 (Fed. Cir. 2011); *Courtesy Prods., L.L.C. v. Hamilton Beach Brands, Inc.*, No. 13-2012-SLR, 2015 WL 7295436, at *4–5 (D. Del. Nov. 18, 2015). Because indefiniteness is a legal question, and the Order's conclusion is contrary to law, the "is to" claims should be held indefinite under 35 U.S.C. § 112 and *Nautilus*.

## III.    Conclusion

For the reasons set forth above, in its claim construction briefing, and at the *Markman* hearing, Google respectfully requests the Court reverse the erroneous claim constructions, sustain its objections, and adopt its proposed constructions.

Dated: August 3, 2026

By:        */s/ Arthur Gollwitzer III*

11

David Silbert (*pro hac vice*)
dsilbert@keker.com
Erin E. Meyer (*pro hac vice*)
emeyer@keker.com
Christopher S. Sun (*pro hac vice*)
csun@keker.com
Andrew S. Bruns (*pro hac vice*)
abruns@keker.com
Vishesh Narayen (*pro hac vice*)
vnarayen@keker.com
Ryan J. Hayward (*pro hac vice*)
rhayward@keker.com
Jacqueline Concilla (*pro hac vice*)
jconcilla@keker.com
Niharika Sachdeva (*pro hac vice*)
nsachdeva@keker.com
KEKER, VAN NEST & PETERS
LLP
633 Battery Street
San Francisco, CA 94111
Tel: 415-391-5400

Nathaniel St. Clair, II
Texas Bar No. 24071564
nstclair@jw.com
JACKSON WALKER LLP
323 Ross Ave #600
Dallas, TX 75201
(214) 953-6000

Arthur Gollwitzer III
Texas Bar No. 24073336
agollwitzer@jw.com
Paige Vonne Welch
Texas Bar No. 24138184
pwelch@jw.com
JACKSON WALKER LLP
100 Congress Ave, Ste. 1100
Austin, TX 78701

*Attorneys for Defendant Google
LLC*

12

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 3, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court for the Western District of Texas, Midland/Odessa Division, using the CM/ECF system, which will send notification and a copy of this filing to all counsel of record who are deemed to have consented to such service under the Court's local rules.

*/s/ Arthur Gollwitzer III*
Arthur Gollwitzer III

13